The action had been brought to Spring term 1867.
As the question involved is an important one, and the contract which gave rise to it seems to have been drawn with care, and as the record which presents it was settled by learned (2) counsel, the Reporter submits the declaration (filed, in the form of a complaint, at Spring Term 1869,) in full: *Page 2 
 IN THE SUPERIOR COURT OF EDGECOMBE COUNTY. John Norfleet, Administrator of David Cobb, Jesse Harrell, George Harris and William T. Cobb, Plaintiffs, Against
Elisha Cromwell, Defendant.
The Plaintiffs above named complaining of the Defendant allege:
I. That on the 20th day of January, A.D., 1855, Eaton Cobb and the Plaintiff Jesse Harrell, were the owners or proprietors of a canal, in proportion of two-thirds to the said Eaton and one-third to the said Jesse, situate in the said County and heading or beginning on the then lands of Amariah B. Cobb, and emptying into the mill stream of Mrs. Mary Gregory, passing through the lands of David Cobb, the said Eaton Cobb and Elisha Cromwell, the Defendant; and on said day, the said Eaton Cobb, the plaintiff Jesse Harrell, David Cobb the intestate of the plaintiff John Norfleet, James Thigpen, Amariah B. Cobb, and the plaintiff Geo. Harris entered into a writing obligatory, under their hands and seals (which writing has been duly proved and registered in the Register's Office of said County) in which the said parties set forth the facts following, and made the following covenants in relation to said Canal:
1. That the said Amariah B. Cobb, David Cobb, James Thigpen and George Harris desire the use of privilege of the said canal, for the purpose of draining all or a portion of the lands of which they are respectively seized and possessed, and have applied for such use or privilege, and all the said parties have come to a full understanding and agreement, one with another, in reference to the said canal, which said understanding or agreement the said parties wish and intend shall be binding, not only upon themselves, but upon their heirs and assigns respectively, quoad the lands specified in (3) said covenant.
2. That the said Eaton Cobb, his heirs and assigns, shall not use the said canal for the purpose of draining any other lands than the tract or parcel of which he was then seized or possessed, adjoining the lands of the said David Cobb and others, containing 314 acres, more or less.
3. That the said Jesse Harrell, his heirs and assigns, shall not in any event, use the said canal for the purpose of draining any other lands than the two tracts or parcels of which he was then seized and possessed, called the David Harrell land, one containing 46 acres, more or less, the other containing 126 acres, more or less.
4. That the said Amariah B. Cobb, David Cobb, James Thigpen and George Harris, their heirs and assigns respectively, shall have, *Page 3 
possess and enjoy the right and privilege of using the said canal, for the purpose of draining all the lands of which they were then severally seized and possessed.
5. That any one or more of the said parties, shall have the right to determine what work is necessary to be done, for the purpose of enlarging, deepening, cleaning out or repairing the said canal, or bridging the same where a public road crosses it, and he or they shall be fully empowered to do the said work, or have the same done, and the said parties shall bear and pay the reasonable expenses and the burden of said work, in the following proportions, to-wit: one-eighteenth to the said Jesse Harrell, his heirs and assigns; one-eighteenth, to the said George Harris, his heirs and assigns; one-twelfth to the said Jas. Thigpen, his heirs and assigns; one-tenth to the said Amariah Cobb, his heirs and assigns, and the balance or residue equally to the said Eaton Cobb and David Cobb, their heirs and assigns respectively.
6. That no person or persons shall be permitted to use the said canal for the purpose of draining his, her or their lands without the consent in writing of a majority of the said parties, and all moneys which may be paid for the privilege of using the said canal, shall go and belong to the said Eaton Cobb and Jesse (4) Harrell, their heirs and assigns respectively, in the proportion of two-thirds to the former, and one-third to the latter.
7. That the said David Cobb, his heirs and assigns, upon cutting a ditch into said canal which shall begin or head in, or pass through any part or portion of such part, or portion of the tract of land to be purchased of the heirs of Solomon Pender, as lies on the North side of the public road leading from Tarborough to Little Creek Meeting House, shall pay to the said Jesse Harrell, his heirs and assigns, the sum of fifty dollars.
8. That the said Jesse Harrell did not then contemplate or expect thereafter to use the said canal for the purpose of draining the larger tract of land hereinbefore mentioned as belonging to him or any part thereof, but in case that the said canal shall be so used by the said Jesse Harrell, his heirs or assigns, then from the time it shall be so used thenceforward, the proportions of the said parties in the expense and burden of the work, which may be done in and upon the said canal as hereinbefore set forth, shall cease, and they shall be as follows, viz: one-twentieth to the said Geo. Harris, his heirs and assigns; one-thirteenth to the said James Thigpen, his heirs and assigns; one-eleventh to the said Amariah B. Cobb, his heirs and assigns; one-sixth to the said Jesse Harrell, his heirs and *Page 4 
assigns; and the balance or residue equally to the said Eaton Cobb and David Cobb, their heirs and assigns, respectively.
II. That on the 29th day of July, A. D., 1858, the said Eaton Cobb, David Cobb, Jesse Harrell, James Thigpen and Geo. Harris, with Henry V. Lloyd, entered into a writing obligatory, under their hands and seals (which writing has been duly proved and registered in the Register's Office of said County) in which the parties set forth the following facts, and made the following covenants in relation to the said canal.
1. That with the consent of all the parties to the agreement (5) or covenant dated as aforesaid on the 20th day of January, A.D., 1855, the said Henry S. Lloyd had then recently purchased of the said Eaton Cobb and Jesse Harrell, proprietors of the said canal, the right or privilege of using the said canal for the purpose of draining certain lands hereinafter mentioned, in the manner and upon the terms hereinafter set forth.
2. That David Cobb had purchased the lands of the said Amariah B. Cobb to which the said agreement applied, and thereby acquired all the rights and privileges, and became subject to all the burdens and duties of the said Amariah.
3. That the said Henry S. Lloyd, his heirs and assigns, shall have and possess the privilege and use of the said canal, for the purpose of draining the whole or any part of the piece or parcel of land known as the Newsom Cromwell tract, adjoining the lands of David M. Cobb, Jordan Knight, Elisha Cromwell, and the said David Cobb, containing about five hundred acres, also the part or portion of the Larkey Booths lands, adjoining the lands of Elisha Cromwell, which is known as the Bearskin Swash or Swamp, the quantity thereof being about fifty acres; in draining the said Bearskin Swash or Swamp, the said canal is not to be cut into or entered, at more than one point or place.
4. That all the rights, privileges and powers, and all the burdens and duties conferred and imposed in the said articles of agreement, of 20th January, 1855, (being numbered in said articles as sections 4th and 5th, but in the clauses above numbers 5 and 6) upon the parties thereto, shall be enjoyed and borne by the parties to this agreement (29th July, 1858) with the following additions and alterations, to-wit: Besides the kind of work specified in section 4 of the agreement of 20th January, 1855, that of removing the earth or dirt which has been or may thereafter be thrown out of the said canal, to a suitable and proper distance from its banks, to prevent them from caving or falling in, is provided for in addition, and the (6) proportions of the work or expenses to be done and incurred by *Page 5 
the respective parties to this agreement, shall be as follows: one twenty-sixth part by the said Jesse Harrell, his heirs and assigns; the same by the said George Harris, his heirs and assigns; one-seventeenth by the said James Thigpen, his heirs and assigns; one-fourth by the said Eaton Cobb, his heirs and assigns; and the balance by the said David Cobb and Henry S. Lloyd, their respective heirs and assigns equally.
5. That the said Jesse Harrell, his heirs and assigns, shall be exempt from performing any labor or incurring any expense for the purpose of widening the said canal, unless he or they shall use the said canal to drain the larger tract of land mentioned in the said articles of 20th January, 1855, of which he is seized, and in case he or they shall so use the said canal, then his or their proportion of all the work to be done on the same shall be one-eighth part, and the shares of the other parties in said work shall be abated or diminished pro rata.
III. That on — day of February, A.D., 1860, the said Henry S. Lloyd by his last will and testament, which has been duly admitted to probate, devised his lands to Mary Louisa Caldwell, W. P. Lloyd, and David Barlow, trustee of Jas. W. Lloyd and children, who were the heirs-at-law of the said Henry S. Lloyd, and by a decree of the Court of Equity of the County aforesaid, his said lands were divided between the said devisees and his heirs-at-law; and the lands hereinbefore mentioned, called the Newsom Cromwell tract, and that known as the Bearskin Swash or Swamp, were allotted and set apart to the said Mary Louisa Caldwell, the devisee aforesaid of the said Henry S. Lloyd, and the wife of John E. Caldwell and wife Mary Louisa, became the sole owners thereof, and held the same in severalty with all the rights, privileges and powers, and all the burdens and duties conferred and imposed upon the said Henry S. Lloyd by the said agreements of 20th of January 1855, and the 29th of July 1858. (7)
IV. That on the 10th day of December, A.D. 1860, the said John E. Caldwell and wife Mary Louisa, by their legally constituted attorney, sold and conveyed by deed to the defendant, Elisha Cromwell, the aforesaid lands so owned and held by them as aforesaid, and the said defendant accepted the said deed containing the following stipulations as to the title thus conveyed: "To have and to hold, both the said tracts or parcels of land, with all the privileges, easements, appurtenances, rights, advantages, burdens and incumbrances thereunto belonging and appertaining unto the said Elisha Cromwell, his heirs and assigns, to the only proper use *Page 6 
and behoof of him, the said Elisha Cromwell, his heirs and assigns, forever." And that the said defendant had notice of the said contract of July 29th 1858, in which the said Henry S. Lloyd, as the owner and proprietor of said lands had covenanted to bear and perform the said burdens and duties, which burdens and duties devolved upon the said Mary Louisa Caldwell as devisee and heir-at-law of the said Henry S. Lloyd, and which covenant of the said Henry S. Lloyd runs with the said lands, and that the defendant is bound as assignee by the said covenant of the said Henry S. Lloyd; or that the defendant contracted with notice of the burdens and duties so imposed upon the said lands, and having accepted the aforesaid deed from the said John E. Caldwell and wife Mary Louisa, with the stipulation aforesaid, is bound to perform the covenant respecting the said lands made by the said Henry S. Lloyd, as aforesaid.
V. That the plaintiff, William T. Cobb, is the heir-at-law of said Eaton Cobb, one of the parties to the said agreements or covenants, dated 20th January, 1855 and 29th July, 1858, and on the 1st day of January, 1866, was seized and possessed of the lands belonging to the said Eaton Cobb, on the day of the dates of said agreements or covenants, and thereby bound by the covenants made by (8) the said Eaton respecting said lands.
VI. That in the year 1862, and years following to 1866, it was necessary to clear out rafts from the said canal, and in the year 1866 it was determined by the plaintiffs, Jesse Harrell, William T. Cobb, George Harris and David Cobb, the intestate of the plaintiff John Norfleet, that work was necessary to be done for the purpose of clearing out the said canal and repairing the bridge across the dam, and they applied to the defendant to perform his proportion of said work, and bear his proportion of the necessary expenses, as he was bound to do, as aforesaid, yet he refused so to do, and the said plaintiffs, Harrell, W. T. Cobb, Harris and D. Cobb, intestate of the plaintiff Norfleet, as aforesaid, in the year 1862, and years following, removed some rafts out of said canal at an expense of four dollars and fifty cents, and in the year 1866, they had the necessary work done and incurred the necessary expenses to clear out and repair the said canal and bridges, to the amount of twelve hundred and fifty-nine dollars and sixty-six cents, which is reasonable, and of which the defendant is liable, as aforesaid, for the sum of three hundred and ninety-eight dollars and eighteen cents, with interest thereon from 1st January, 1867.
VII. That no part of the same has been paid by the defendant to the said plaintiffs, Harrell, Cobb and Harris, or to David Cobb the intestate of the plaintiff Norfleet, before the death of said David, *Page 7 
on the — day of April, 1867, and that subsequent thereto the plaintiff Norfleet was duly appointed the Administrator of the said David Cobb, and no part of the said money, has been paid to the plaintiff Norfleet.
Wherefore, the plaintiffs demand judgment against the defendant for the sum of three hundred and ninety-eight dollars and eighteen cents with interest thereon from 1st January, 1867, together with the costs, expenses and disbursements of this action.
Two questions are raised by the demurrer:
I. Can the plaintiffs recover without an averment that the defendant had notice that the plaintiffs had repaired the canal, and of the amount of his liability? We think not. The rule on this subject is well stated in 1 Chit. Pl. 360: "When the matter alleged in the pleading is to be considered as more properly lying in the knowledge of the plaintiff than of the defendant, then the declaration ought to state that the defendant had notice thereof; as where the defendant promised to give the plaintiff as much for a commodity as another person had given or should give him for the like; or to pay the plaintiff what damages he had sustained by a battery; or to pay the plaintiff his costs of suit. But where the matter does not lie more properly in the knowledge of the plaintiff than of the defendant, notice need not be averred." The rule is copiously exemplified in Com. Dig. Condition L. 8; and another illustration may be found in the case where one of several co-sureties pays the debt, he cannot recover of another co-surety without notice of such payment: (11) Sikes v. Quick, 52 N.C. 19. The omission of an averment of notice when necessary (though it will sometimes be cured by verdict) will be fatal on demurrer, or after judgment by default: 1 Chit. Pl. 362. In this case, although it might be presumed that the defendant had notice that some work was done on the canal, yet he cannot be presumed to know by which of the contracting parties it was done, or its cost; and, consequently, the extent of his liability. Those were matters peculiarly within the knowledge of the plaintiffs. But it is urged that the disclaimer by the defendant of any *Page 9 
liability under the covenant, before the work was done, dispensed with notice afterwards. The fact relied on as dispensing with notice is properly set forth in the complaint, and the question is as to its sufficiency. We think it is not sufficient. Notice is dispensed with where the party absconds; Viner's Abridg. Notice, A-2; and in some cases notice of the dishonor of a bill of exchange is dispensed with; Byles on Bills, 219; but none of the examples given seems analogous to this. What is it that the defendant is entitled to have notice of, and for what purpose? Of his liability, and of the amount of it, in order that he may have the choice of paying without suit. The defendant in this case had notice of the covenant; but that created only a contingent liability, which could only become absolute by some act to be done by the other parties, or some of them. Before such act, the plaintiff had no right of action, and the defendant could not pay; and it was of this act, therefore, that the defendant was entitled to notice. It was the contingent liability which the defendant disclaimed, and we think he was entitled to notice after it had become an actual and definite cause of action. Upon this point, therefore, the demurrer must be sustained.
II. As this disposes of the present action, we might decline to go further, and to express any opinion upon the question which would have been raised by the demurrer, if the complaint had contained an averment of notice. But as it is one of much interest and importance, especially in the eastern part of the State, where (12) contracts of this sort have been common, and as we have formed a decided opinion upon it, we see no good reason why it should not be stated now, rather than deferred until this case shall again come before us with a proper averment, as from its importance we may infer that it would.
This question is, whether the burden of the covenant by Lloyd to contribute to the repair of the canal, runs with the land, and binds the defendant as his assignee. The contract between the parties to the deed of July 1858, is in the form of mutual covenants, and is, in substance, that a certain canal (then existing) shall continue to run through certain lands of the parties, for their benefit respectively, and that each and his assigns, being the owners of the described lands, shall contribute in certain proportions to its repair. We think it clear that one effect of the contract, was to grant to each of the parties an easement in fee, appurtenant to their several described pieces of land, and passing both as a benefit and as a burden to subsequent assignees. The lands of each became both servient and dominant to the lands of the others, for certain purposes. The easement of the upper proprietor, was the right to the free flow of the water *Page 10 
from his land through the canal; that of the lower one, was not only the right to drain the water from his land through the canal, but also, that the upper proprietors should permit the water from their lands to flow through the canal, to answer in its course any lawful use to which he might be minded to put it. An easement is generally, and in general most naturally and properly, created by words of grant; but words of covenant may be equivalent to a grant if such be the clear intention: Gale and Whately, Easements, 32; Washburn Easements, 34; Holmes v. Sellars, 3 Lev. 305; Brewster v. Kitchell, 1 Salk. 198; Hills v. Miller, 3 Paige 254; Watertown v. Cowen, 4 Paige 510; Barrow v. Richard, 8 Paige 351; American Notes to 1 Smith, L.C. 143. Domat, § 1017, copying from the Institutes, (13) says, that "services are most commonly settled by covenants." Indeed, it is difficult to conceive how, otherwise than by covenants, a servitude consisting in an act to be done by the owner of the servient land, can be created: e. g. the payment of a rent, or, as in this case, a contribution to repairs: Blount v. Harvey, 51 N.C. 186, is not opposed to this principle. All that was there held was, that, considering the nature of the matter contracted for, the parties intended only a personal covenant, and not the grant of an easement.
In the case now before us, we think there can be no room for a doubt as to the intention of the parties. The rights and obligations which they created, were to be permanently attached to their respective lands; and to be of any value, they must be. Their purposes would be defeated by holding that the obligations rested only in personal covenant, and were subject to be practically extinguished by a sale, or the death of any of the parties.
It may be admitted, however, that the contract operated as a grant, and created mutual easements and servitudes; but this admission would not cover the whole ground, and would still leave it to be determined whether the contract to contribute to the repairs, was a part of the servitude capable of being enforced against an assignee. This is, in fact, the main question; for, although it were held that an upper proprietor has, by the contract, the easement of drainage through the lower lands, and a lower one the right to enjoy that drainage, yet, if neither can be compelled to contribute rateably to the repairs of the canal, which must thus be left to depend on the casual and uncertain exigencies of each beneficiary, without any provision for an equitable adjustment of the parties, as well them, it must be manifest that the intentions of the parties, as well as the useful results of their agreement, will be mainly defeated.
With a bare reference to the authorities collected in the notes to *Page 11 Spencer's case, 1 Smith L. C., it may be assumed, that in England a covenant like this, made by a lessee to a lessor, (14) would run with the lands, and bind the assigns of the lessee; and, although we are not aware of any English case precisely deciding that, in case it were made by a grantee or owner in fee, it would not do so, yet the high authority of Mr. Smith, and of his American editors, and of other recent expressions of judicial opinions, is in that direction. If, however, instead of submitting implicitly to what seems the weight of opinion, we venture to inquire why such a covenant should be valid in the case of a lessee, and not in that of an owner in fee, we think it will be found either that the reasons have no weight, or are inapplicable to a case like this. In the first place, it is said that the covenant binds the assigns of a lessee, because there is a privity of estate between them and the lessor, who is the covenantee, and none in the other cases. But this, we submit, is not giving a reason for the difference, but only stating the rule in other terms: That where there is a reversion, the covenant will run, and where there is none, it will not. In Pennsylvania, (where it is said that the statute quia emptores, forbidding subinfendation, has never been in force, and where consequently on every grant in fee there is a possibility of reverter by escheat,) on that ground covenants by owners in fee run with the land, as they do when by lessees: Am. notes to Spencer's
case, ubi sup. This shows that the reason for the rule which founds it on privity of estate, is arbitrary, and not a rule of reason, and may be dismissed as insufficient.
In Mr. Smith's note to Spencer's case, 1 Smith L. C. 31 a. 35, 38, the rule is defended on the ground of the inconvenience which would result to the assignee, who might find himself liable for the execution of covenants of whose existence he was ignorant: and Lord Chancellor Brougham, in Keppel v. Bailey, 2 Myl. And K. 517, (8 Cond. Eng. Ch. Rep. 111), while he refutes the idea that such a covenant is illegal because it tends to create a perpetuity, thinks that "great detriment would arise and much confusion of rights, if parties were allowed to invent new modes of holding and (15) enjoying real property, and to impress upon their lands and tenements a peculiar character which should follow them into all hands, however remote. Every close, every messuage, might thus be held in a several fashion, and it would hardly be possible to know what rights the acquisition of any parcel conferred, or what obligations it imposed. The right of way or of common is of a public, as well as of a simple nature, and no one who sees the premises can be ignorant of what all the vicinage knows. But if one man may bind his messuage and land to take lime from a particular kiln, another *Page 12 
may bind his to take coals from a certain pit, while a third may load his property with further obligations to employ one blacksmith's forge, etc., etc."
It must be admitted that there is some weight both in the reason of Mr. Smith, and in those of the Chancellor. Mr. Smith's, however, has less weight in this State, where all deeds affecting real property are required to be registered, than in England. In this case, also, the nature of the covenant is such as almost to imply notice to an assignee of the lands: the easement is apparent and might not unfairly be held to put an assignee on inquiry as to the covenant which qualifies and regulates it. It is not easy to see why both the objections are not as applicable to a covenant by a lessee as by the owner of a fee. It is not anywhere said that the covenant of a lessee must necessarily be contained in the lease, and if it were in a separate instrument, it might be as much unknown to an assignee of the lease, as a covenant by an owner in fee might be to his assignee. In either case, and equally in one as in the other, the benefit of the covenant could be released, and the land set free. The inconvenient conditions which the Lord Chancellor supposes might be attached to lands, all materially differ from this, in that they do not arise out of the land burdened, or qualify any apparent easements, but are collateral in their nature. In this case the easements and servitudes created by the contract (16) are of a character whose utility has long been recognized by the law. Roads and Aqueducts are the two sorts of rural services mentioned in the Digest.
The Revised Code, ch. 40, provides that the owners of upper lying lands may procure, through the Courts, the easement of drainage: it left, however, the whole burden of construction and repair on the upper proprietor. The act of 1868-'69 endeavors to remedy this omission, and provides how these burdens may be adjusted among the parties interested. The end sought to be attained by this contract, is in harmony with the policy of our legislation, and is necessary for the improvement of the level parts of the State. We think that the stipulation respecting repairs, is an essential part of the easement and servitude which the defendant acquired both as a benefit and a burden appurtenant to his lands, and which cannot be separated from it without injustice, and that therefore the covenant runs with the land and binds the defendant. The canal has been cut; the defendant cannot, in the nature of things, release the benefits which he acquired; the land cannot be returned to its former condition, and the maxim applies qui sentit commodum, debet sentire et onus. This is illustrated by Rex v. Inhab. Kent, 13 East 220, where a corporation, which had been allowed to cut a canal across a highway, was *Page 13 
held bound to the repair of a bridge over it; and our legislation, by which owners of land cutting ditches through a highway, are bound to maintain bridges over them, is analogous: Rev. Code, ch. 101, § 24.
It seems to me that these observations furnish an answer to the reasons alleged as preventing an owner in fee from subjecting his land to a burden of this sort. I also venture to differ from Mr. Smith as to the construction of the cases of Brewster v. Kitchell, 12 Mod. 166, Holmes v. Buckley, 1 Eq. Ab. 27, cited by him: to these may be added Barclay v. Raine, 1 S. and Stu. 449. These cases, it seems to me, support the argument for the plaintiffs in the present case, and by properly distinguishing the sorts of servitudes, may be (17) reconciled with the reasoning of the Chancellor in Keppel v.Bailey.
This decision is limited to cases in principle like this: where the intent to create an easement is clear, where the easement is apparent, and where the covenant is consistent with public policy, and so qualifies or regulates the mode of enjoying the easement, that if it be disregarded, the easement created will be substantially different from that intended. How it would be in a different case, we do not undertake to say.
Demurrer sustained. Judgment for defendant.
Per curiam.
Judgment reversed.
Cited: Parham v. Green, 64 N.C. 438; School Comm. v. Kesler, 67 N.C. 447;Sc., 70 N.C. 634; Busbee v. Comrs., 93 N.C. 147; Puitt v. Comrs.,94 N.C. 717; Herring v. Lumber Co., 163 N.C. 486; Parrott v. R. R.,165 N.C. 300, 316; Ring v. Mayberry, 168 N.C. 565; Davis v. Robinson,189 N.C. 600; Brick Co. v. Hodgin, 190 N.C. 585; Walker v. Phelps,202 N.C. 349; Waldrop v. Brevard, 233 N.C. 30; Borders v. Yarborough,237 N.C. 542; Stephens Co. v. Lisk, 240 N.C. 292. *Page 14