WASHINGTON TOLL BRIDGE COMPANY v. COMMISSIONERS OF BEAUFORT.

*Constitutional Law—Obligation of Contracts—Repeal of Penalty.*

1. *It seems* that the general assembly cannot, by contract or otherwise, deprive itself or its successor of the power to provide or authorize those increased facilities for transit over its public waters conferred by the organic law, which the necessities of trade and business may require.

2. An act of assembly which confers upon a private corporation the exclu. sive right of transporting passengers across a navigable river for a distance of six miles from a certain point opposite a large trading town, in consideration of a reduction, by one-half, of the former toll rates paid by the residents of defined parts of two counties, while full rates are to be paid by all others, is obnoxious to the constitutional inhibition against monopolies.

3. A penalty is no part of the obligation of a legislative contract, and it is competent for the general assembly to repeal it at any time, if other adequate legal means of protection and redress are left unimpaired..

(*McRee* v. *R. R. Co.*, 2 Jones, 186; *R. R. Co.* v. *Reid*, 64 N. C., 155; *Carrow* v. *Washington T. B. Co.*, Phil. 118; *Long* v. *Beard*, 3 Murp., 57; *Richardson* v *Wicker*, 80 N. C., 172; *Taylor* v. *R. R. Co.*, 4 Jones, 277, cited and approved.)

CIVIL ACTION to recover a Penalty tried at Fall Term, 1878, of BEAUFORT Superior Court, before *Eure, J.*

On the 24th day of December, 1812, the general assembly passed an act incorporating "the president, directors and

company of the Washington toll bridge," and authorized the company, when constituted according to the provisions of its charter, " to build a bridge across Tar river, above the town of Washington in Beaufort county, and near the said town, to commence at Bridge street next above and adjoining a lot belonging to Walter Hanrahan, situate on the north west end of said town and to extend across said river to the nearest land on the opposite side of the same, and from thence to make a road and causeway through the marsh and swamp to some convenient place of intersection with the road that now leads from Washington to Newbern," declaring that " the right and property of said bridge and road or causeway, and the emoluments and profits arising therefrom, shall rest in, and belong to the stockholders, or subscribers composing said corporation according to their proportionate shares and to their representatives and assigns."

The seventh section of the act authorizes the erection of a toll-gate on the bridge and prescribes what " shall be the usual rate of toll " to be charged and collected at the gate on persons and property passing through it. The company was regularly formed and organized, under the provisions of the charter, the road opened and the bridge constructed, and tolls levied and collected, until its destruction during the late civil war, since which time the bridge has been rebuilt and kept up, and the conferred franchise exercised as before.

In the year 1783 a charter was granted and a company formed under it " to build a road through the marsh opposite Washington into a road " then in use, and to open and operate a ferry thence over Pamlico river to said town, for certain tolls to be fixed and regulated by the county court of Pitt—the control of which with the territory has been since transferred to Beaufort county. Under the act the road was laid out, and the ferry established and maintained for many years before and after the grant of chartered privi-

leges to the plaintiff and up to the year 1833, when it was discontinued. One-half of the stock of the ferry company has been purchased by and belongs to the plaintiff.

On the 11th day of December, 1866, an act amendatory of the plaintiff's charter was passed reducing "the tolls and charges upon the inhabitants of Beaufort county residing on the south side of Pamlico river, between Blount's creek on the east, including Buck's, Burney's, Haddock's and Taft's districts in Pitt county, extending to the Craven county line on the south, *to one-half of the rates and charges* specified in the charter and amendments thereto, heretofore granted."

The second section of the act is in these words: "No bridge or ferry shall be kept or established upon said river for the purpose of transporting any person or his effects across the same, either for pay or without pay, *within the distance of three miles* from said bridge under the penalties prescribed in section thirty of the one hundred and first chapter of the Revised Code." The act is made to take "effect from the time the president and directors of the Washington toll bridge company accept the same, and signify such acceptance to the secretary of state. The company two days thereafter assented to the proposed amendment and filed written evidence thereof in the secretary's office.

At an adjourned session beginning in January, 1867, the general assembly passed an act, which was ratified and went into operation on the 21st day of February, repealing the act of December 11th, 1866; and on the 4th of March following by another enactment conferred upon certain persons, therein named, authority "to establish and keep up a free ferry across the Pamlico river, opposite the town of Washington in the county of Beaufort on the old ferry road" and annulling all laws in conflict with its provisions.

In the year 1878 the board of county commissioners of Beaufort, co-operating with the township trustees, appointed and settled a free ferry, according to the requirements of

chapter 104, Bat. Rev., between the end of Gladden street where it touches the river in said town and the terminus of a public road on the opposite side; and in October last a steam ferry boat was employed to transport persons and property over the river without charge.

The Rev. Code, ch. 101, § 30, referred to in the amendment to the plaintiff's charter, declares that "if any unauthorized person shall pretend to keep a ferry, or to transport for pay any person or his effects within ten miles of any ferry on the same river or water which theretofore may have been appointed, he shall forfeit and pay two dollars for *every such offence* to the nearest ferryman."

In this action the plaintiff seeks to recover the accumulated penalties of two dollars for each person gratuitously carried over the river by the defendants' boat, and upon such estimate was adjudged the sum of three thousand eight hundred and forty dollars, double the number of passengers. Judgment for plaintiff, appeal by defendants.

*Messrs. G. H. Brown, Jr.,* and *D. G. Fowle,* for plaintiff:

1. The rights of plaintiff are based upon the act of 1867, ch. 80, p. 337, which was attempted to be repealed by an act passed at the same session, p. 266. The legislature had no power to repeal the first named act, because it would impair the obligation of a contract. A legislative contract between the state and a citizen is as much entitled to the protection of the constitution of the United States as any other. *Fletcher* v. *Peck,* 6 Cranch, 87; *Butler* v. *Penn,* 10 Howard, 416. No power is reserved by legislature to change first act without plaintiff's consent. It is a mutual compact, and rights which have vested under it cannot be destroyed. *Wade* v. *Stetson,* 2 Mass., 146; 4 Wheat., 519; 18 Conn., 65; 7 Conn., 44; 10 Conn., 541; 17 Johnson, 215.

2. As to want of power of legislature to repeal railroad charter under certain circumstances, *Boston* v. *R. R. Co.,* 2 Gray,

1; Sedgwick Stat. and Const. Law, 638. Exclusive privilege conveyed by charter of this plaintiff, and our case is not governed by the rule laid down in the *Bridge case,* 11 Pet., 420; and the legislature has no power to grant authority to erect another bridge in the limits prescribed. 5 Johns. Chan., 101; 63 Barb., 111; 2 Porter (Ala.), 296; 18 Conn., 53; 7 N. H., 35; 4 Tenn. Rep., 666; 9 Ga., 517; 16 Howard, 524; 10 Ala., 37; 8 Bush. (Ky.), 31.

3. In *Long* v. *Beard,* 3 Murp., 57, there was no exclusive grant, as here. Our case is also distinguished from *McRee's,* 2 Jones, 186.; and *Taylor's,* 4 Jones, 277, is an authority somewhat in favor of plaintiff. Legislative right to grant privilege of ferry expressly affirmed in *Barrington* v. *Neuse River Co.,* 69 N. C., 165. Monopoly and franchise are in fact widely different both here and in England. 11 Pet., 606. It is admitted in the case that plaintiff has strictly complied with first named act, and that the bridge does not obstruct navigation. If the legislature had no right to repeal the charter, the plaintiff is entitled to recover the penalties.

*Mr. W. B. Rodman,* for defendants:

1. Plaintiff has no *exclusive* right against defendants to prevent *them* from setting up a free ferry. Original charter to plaintiff in 1812 contained no words of exclusion and legislature could nevertheless grant a ferry privilege to others. 11 Pet., 420. The legislature denied this right. Rev. Code, ch. 101, §§ 1, 2, &c. It was sanctioned by this court. *Beard* v. *Long,* 2 Car. L. Rep., 69; 3 Murp., 57; *Smith* v. *Haskins,* 3 Ire. Eq., 613; *McRee* v. *R. R. Co.,* 2 Jones, 186; *Taylor* v. *R. R. Co.,* 4 Jones 277; *Barrington* v. *Neuse River, &c.,* 69 N. C., 165.

2. The *exclusive* right is claimed by plaintiff under the act of December 11th, 1866. Considering that act as if unrepealed, the answer to the claim of an exclusive right, is: The ferry company chartered in 1783 had a ferry right, and

that company alone could complain of the usurpation of their right by defendants, and secondly, the act of December 11th, 1866, created a monopoly and was void. Const. of N. C., Art. I, § 23; *McRee's case, supra,* 2 Greenl. Cruise, 57; Cooley Const. Lim., (4 Ed.) 344. It was not valid as a contract for want of a sufficient consideration.

3. The act of December 11th, 1866 was wholly repealed by the acts of 1866–'67, ch. 16, p. 266, and ch. 121, p. 195. A legislature may repeal an act during the same session. Sedg. Stat. and Const. Law, (1st Ed.) 122; Cooley Const. Lim., 344, note. Acceptance of act of December 11th, 1866, did not divest this right. Acceptance was premature before the act had gone into effect and before the offer had become binding on legislature; act did not go into effect until thirty days after the rise of legislature, (Rev. Code, ch. 52, § 36) and was subject to the general law. *State* v. *Krebs,* 64 N. C., 604; Cooley, *supra; Com'rs* v. *Ballard,* 69 N. C., 18; *Madre* v. *Felton,* Phil. 249; *Pugh* v. *R. R. Co., Ibid.,* 359. And it will not be presumed that the state intended to create a monopoly or give up any part of its sovereign power. *Johnson's Appeal,* supreme court of Pa., 27 May, 1878, in Reporter of Oct. 1878.

4. This is an action to recover penalties given by act of December 11th, 1866, by reference to chapter 101, § 30 of the Revised Code: These are given only against *unauthorized* persons, which means those who have *no color of right.* Here, the defendants had at least color of right under act 1867, ch. 121, p. 195, and not liable by obeying that act, even if unconstitutional; were not supposed to know that it was unconstitutional. *Hicks* v. *Minturn,* 19 Wend., 550; *Sessoms* v. *Botts,* 34 Tex., 335. Legislature might at any time repeal act of December 11th, as to the penalties. *Hoppock* v. *Thompson,* 49 Barb., 524.

5. If the act of the county commissioners in establishing the ferry was unlawful and *ultra vires,* the county is not

liable by reason of it. *Mayor of Albany* v. *Cerliff*, 2 N. Y.,. (2 Coms.) 165; *Morrison* v. *Lawrence*, 98 Mass., 219; 30 Md.,. 218; 52 Me., 118; 62 Me., 504; 4 Sneed, (Tenn.) 162; 54 Ga., 458; *Murtaugh* v. *St. Louis*, 44 Mo., 479. See also *Smith* v. *City of Rochester*, N. Y. Court of Appeals, 25th March,. 1879, reported in 19 Alb. Law Journal, 455.

SMITH, C. J. (After stating the case.) Numerous points. were made and discussed by defendant's counsel, of which it is only needful to specify the following:

1. The grant of an exclusive right to plaintiff to provide· means of transit over the river for the space of six miles,. contained in the act of December 11th, 1866, is inoperative· and void as conferring special privileges without adequate or indeed any proper consideration to the state.

2. The general assembly cannot by contract or otherwise· divest itself or deprive its successor of the power to provide· or authorize those increased facilities for transit over its. public waters, conferred by the organic law which the ne-- cessities of trade and business may require.

3. The consideration for the grant is itself a bestowal of special privileges to a few, to the injury of the rest of the· people interested, and, as such, illegal and unwarranted.

4. The general assembly was competent to pass the re- pealing act and arrest action under it, during the same ses-- sion, notwithstanding the plaintiff's assent, and the contract was not before final adjournment consummated so as to be· within the protection of the constitution of the United States.

5. The repeal if ineffectual to withdraw the exclusive· privileges conferred or to impair the legal remedies then ex- isting for their enforcement, is valid in withdrawing the· provided penalty.

6. The political body represented by the county commis- sioners is not responsible for their illegal acts, nor is the:

32

taxable property of the people chargeable for the consequences thereof, the liability, if any, being personal to the commissioners and their agents.

These and other propositions were enforced and combatted by the counsel for the respective parties in the argument and numerous cases cited and commented on. Our attention will be confined to the consideration of some of them only.

While contracts made by a state with corporations or individuals and embodied in an act of legislation, which the state under its organic law is competent to enter into, are protected from violation by the clause in the constitution of the United States (Art. 1, § 10) which forbids the passing of any "law impairing the obligation of contracts," it is equally necessary that the essential powers of government, conferred for wise and useful purposes, should remain undiminished and unimpaired in the legislative body itself and pass in full force to its successor. When a contract undertakes to alienate any of these, it is inoperative, and as no right vests so no obligation is created under it. The principle is very clearly and strongly stated by Judge COOLEY thus: "To say that the legislature may pass irrepealable laws is to say that it may alter the very constitution from which it derives its authority; since in so far as one legislature could bind a subsequent one by its enactments, it could in the same degree reduce the legislative power of its successors, and the process might be repeated until one by one the subjects of legislation would be excluded altogether from their control, and the constitutional provision that the legislative power shall be vested in two houses would be to a greater or less degree rendered ineffectual." Const. Lim., 125, 126. In a note contributed to the edition of Cruise's digest by Greenleaf, a clear distinction is drawn between those restrictions upon legislative power which may be imposed and transmitted as binding upon a succeeding legis-

lature, and those which attempt to abridge or impair the substantial powers of government, the indispensable attributes of sovereignty itself, the right to exercise which when demanded for the public convenience is vested in the body and inalienable. " It is therefore," says the editor, " deemed not competent for a legislature to covenant that it will not, under any circumstances, *open another avenue to the public travel* within certain limits, or a certain term of time, such being an *alienation of sovereign powers* and a *violation* of *public duty.*" The doctrine, as thus announced, would seem to meet the facts of the present case. The general assembly not only bestows a valuable franchise upon the plaintiff, but undertakes to deprive itself and all succeeding assemblies of the right to establish or authorize others to establish the same, or any other mode of passing over the river for a space of six miles up and down a large navigable river open and accessible to sea-going vessels, without regard to the future growth of the surrounding country in population, wealth and business, and the necessity for increased facilities for intercourse which inseparably attends such growth. Practically all water transit below the prescribed limit is interdicted, as the case states, by natural obstructions, there met with, to the establishment and working of a new ferry, inconvenient, if not insurmountable. The monopoly is secured, as the plaintiff contends, against interference by an irrevocable penalty which gives forty times the value of the toll lost on each passenger, and the full measure of the injury to the franchise for his transportation. We should hesitate to admit the binding force of such a legislative contract with its consequences, and that it was beyond the reach of remedial legislation and correction.

Suppose the town had advanced and prospered until its inhabitants numbered the population of a great city, and as a natural accompaniment, other thrifty and flourishing towns had sprung up on the opposite bank, reclaimed it

may be from overflow, would the legislature be disabled by
this bartering away of its power to afford any relief by
opening or authorizing to be opened new channels of inter-
course and new avenues of trade? Would the grant be a
perpetual bar to all improvement and progress, unless vol-
untarily removed by one interested in keeping it up? Or
putting another case: Suppose that the legislature should
incorporate a turnpike company and grant it the exclusive
right of constructing a road between two places which had
become prosperous and populous cities, demanding new av-
enues of trade and large facilities for outer communication,
stipulating in the charter that no other road for the trans-
portation of goods and the conveyance of persons should be
allowed, and providing severe penalties against any inva-
sion of this special privilege, could no railroad or canal be
constructed to meet the necessities of trade and commerce,
and could the surrendered power never be resumed or exer-
cised to afford the needed relief?

The pressure of the question and its obvious embarrass-
ments have led some of the courts to intimate that a remedy
for the grievance may be found in the right of eminent do-
main, and making full compensation for the property taken.
The object however is not the condemnation of the plain-
tiff's bridge and his right to demand toll from such as use
it, but to remove the excluding features of the grant which
rest simply in the contract. If the constitution inhibits in-
terference with the provisions of the act because it consti-
tutes a contract, how can its obligation be impaired any
more by exercising the right of eminent domain, than by
exercising any other fundamental legislative power? Why
should the disability attach to the one more than to the
other? If the integrity of the obligation is preserved under
the constitution, it would seem to be protected from inva-
sion in any form by the contracting parties. If a valid con-
tract is entered into, undoubtedly these consequences follow,

and the only practical solution of the difficulty is to be found in the doctrine that the legislature of a state is incompetent to enter into stipulations whose effect is to deprive it of any of its essential powers, and that to this extent the undertaking is inoperative and void. In other words, no such obligation arises out of the act, to be protected by the constitution.

These considerations in connection with the rapid advance of the country notwithstanding the numerous decisions in which contracts of this kind have been upheld, and the surrender of legislative power enforced, have drawn the attention of jurists to a fresh examination of the scope and effect of the provision in the federal constitution to which such serious consequences are ascribed, and the tendency is to limit it to cases in which no essential function of the government, indispensable to the public good, is abnegated, and to sustain the inalienability of such as are.

Thus in *The Mohawk Bridge Co.* v. *The Utica and Schenectady R. R. Co.,* 6 Paige, 550, where the plaintiff sought to enjoin the defendant from erecting a bridge over the Mohawk river at Schenectady, to be used as a part of its railway and the relief was refused, Chancellor WALWORTH incidentally remarks : "The legislature has indeed protected the Mohawk bridge company in the enjoyment of an exclusive right to carry passengers across the river at Schenectady to a certain extent by prohibiting others from establishing a ferry within a certain distance from the toll bridge; but it has not deprived a future legislature of the right to authorize the erection of another bridge *within the prescribed limits whenever the public good shall appear to require it.*"

In *McRee* v. *R. R. Co.,* 2 Jones, 186, the plaintiff sought to recover of defendant a penalty incurred by an invasion of the exclusive right conferred by his charter, and wherein it is declared to be unlawful for any person whatever to keep any ferry, build any bridge, *or set any person or property* over

the river, for fee or reward, within six miles of the bridge, under a penalty of twenty shillings. The court held that the grant, upon a strict construction of its terms, did not contemplate the case then presented, and referring to the interpretation contended for by the plaintiff, say : "It was unreasonable on the part of the governor, council, and assembly, in consideration of building a bridge, to confer a perpetual monopoly and take from themselves and their successors, for all time to come, the power of doing that for which all governments are organized—promoting the general welfare by adopting such measures as a new condition of things might make necessary and taking advantage of such improvements and inventions as after ages might originate for the benefit of the public. In other words, it is unreasonable to suppose that they intended to surrender the means by which they and their successors might thereafter be enabled to effect the purpose for which they were created and formed into a government."

The inability of the depositary of legislative power under the constitution to part with any essential portion by an irrepealable enactment is strongly presented in the opinion in *R. R. Co.* v. *Reid*, 64 N. C., 155, and the consequent inconveniences pointed out ; and although that decision was reversed in the supreme court of the United States, the general principle is not denied or impugned. To remove this barrier to the progress of internal improvements and meet the wants of a country so rapidly advancing in numbers and material wealth, the rule of strict construction is applied to such grants, and it is held that, unless upon the clearest intent, they will not be allowed to hamper and restrain the exercise of legislative power. Hence railroads are permitted to construct bridges, as part of their line, over streams, when the exclusive right of transportation by bridge or ferry across them has been conferred upon another person or company, as has been held in *Thompson* v. *The N. Y.*

*& H. R. R. Co.*, 3 Sand., Ch. 625, and in *McRee* v. *R. R. Co.*, *supra*. But it is unnecessary and we do not mean to determine that the exclusive privileges granted to the plaintiff in the present case can be recalled at the will of the general assembly, and the discussion is intended to direct attention to the difficulties of the subject. We place our decision upon other distinct and independent grounds, which we will now proceed to state:—

It is decided in *Carrow* v. *Washington Toll Bridge Co.*, Phil., 118, that under the charter of 1812 no such exclusive privileges were conferred as interfered with the power of the corporate authorities of the county to order the establishment of a ferry over the river, "notwithstanding its propinquity to the toll bridge of the defendants," and the court say : "This power is one of the *attributes of the .sovereignty* of the state, which is to be exercised by the legislature itself or by any agent whom that body may authorize to act for it," and that the county authorities are such agents under the act of 1784 (Rev. Code, ch. 101).

The act of December 11th, 1866, was passed during the pendency of that action, and while noticed in the opinion was not so brought forward as to be within the judicial cognizance of the court. The existence of this amendment alone distinguishes the pending action from that case, and requires us to consider its operation and effect. This we will briefly do.

The act proposes to reduce the charges for passing over the bridge to *one half the existing rates to be paid by the residents of defined parts of Beaufort and Pitt counties, while full rates are to be paid by all others*, and as the consideration of the partial concession imposes a prohibition against the opening of any other mode of transportation, whether free or for pay, for a distance of six miles across the river. It not only discriminates between residents of the same county in the tolls to be paid by them, but it forbids future relief to those upon whom

the heavier burden is put.   Not only is the special and ex-
clusive privilege of transportation conferred upon the plain-
tiff, but such special privileges are conferred upon a few at
the expense of the many without any other apparent ground
for the discrimination, except that those thus favored may
have a more frequent use for the bridge.   The people of the
town of Washington and others living on one side of the
river pay double the rates of those residing on the other, in
the boundaries of the favored territory.   Was the general
assembly competent to enter into such a contract, and is it
within the guaranty of the constitution beyond modifica-
tion or repeal by itself or its successors?   We should not
hesitate in declaring our opinion, were the question original
and open, but it is disposed of in *McRee* v. *R. R. Co.*, already
cited, and we can add little to what was said by PEARSON,
J., in delivering the opinion in the case : "We are not, how-
ever, under the necessity of putting the decision upon the
mere question of construction, for our declaration of rights
at once puts an end to such unreasonable pretension or claim
to an hereditary and perpetual monopoly as that set up by
the plaintiff.   Declaration of Rights, § 3: 'That no man or
set of men are entitled to exclusive or separate emoluments
or privileges from the community but' in consideration of
public services.'   § 22 : 'That no hereditary emoluments,
privileges or honors ought to be granted or conferred in this
state.'   § 23. 'That perpetuities and monopolies are contrary
to the *genius* of a free state and ought not to be allowed.'
The meaning and purpose was to forbid and abolish all
hereditary and perpetual monopolies as contrary to the ge-
nius of a free state, and to put in motion the new state they
were then organizing as *a free representative republican govern-
ment* relieved from all fetters and trammels previously ex-
isting by which its action might be cramped or circum-
scribed, and fully *authorized to do everything necessary* and
proper to accomplish its mission, that is, promote the gen-

eral welfare." The life of the plaintiff corporation, it is true, was limited to eighty years, of which twenty-six remained when the grant was made, yet the case comes within the mischiefs these constitutional declarations were intended to remedy, when then existing, and to prevent their recurrence in the future; and it falls under the denunciation of these utterances of the fundamental law that lies at the basis of free institutions. Discriminating privileges are conferred for no "public services" now or hereafter to be rendered, and for no apparent consideration promotive of the common good; and this partial and unjust discrimination becomes itself the basis for the imposition of innumerable burdens upon the unfavored many. We are unwilling to uphold the validity of a contract though assuming the form of law, involving distinctions so unequal and unjust, and invading those great elemental truths so clearly enunciated in the fundamental law, as being beyond future legislative correction or control.

In *Bradley* v. *The N. Y. & N. H. R. R. Co.*, 21 Com., 306, the court say, and it meets our full approval: "As between individuals it is the duty of the state to protect them in the enjoyment of just and equal rights." But there is a further, and in our opinion not less fatal obstacle to the plaintiff's recovery, resulting from the operation of the repealing act of February, 1867. Admitting that the franchise and the exclusive privileges attached to it with the prohibitions against any interfering enterprise, cannot be recalled or abridged, it by no means follows that the superadded penalties may not be revoked, without impairing the obligation of the contract, while all other legal remedies are left in full force. This effect then may be given to the repealing statute, if it is inoperative to recall the grant itself, and the remedies there provided by law for its security against invasion. The penalty is not part of the contract, and its withdrawal does not impair any of the plaintiff's constitutional rights,

and it is not a substitute for his common law remedies. This is so decided in *Taylor* v. *Wil. & Man. R. R. Co.*, 4 Jones, 277, wherein the court say : " It was thought by some that the statute, by inference, denied the common law right against a person who transported any person without pay. The point was made by the case of *Long* v. *Beard*, 3 Murp., 57. It is there held that the statute is cumulative in regard to the remedy and left the common law right of ferrymen untouched, and it was decided that the plaintiff had a right of action against the defendant for erecting a free ferry within one mile of his ferry ". * * * " whereby the plaintiff's custom was drawn off and his profits diminished."

The sanctity of a contract under the constitution declared inviolable extends to all such rights and interests as grow out of it, and to the necessary means there provided by law for their protection and for securing redress for injuries done to them. We do not understand the constitutional guaranty as embracing those further provisions, whereby a violation of such rights is made an indictable offence, or a pecuniary penalty is imposed. These constitute no part of the legal obligation, and as they are given from consideration of public interest, so they remain under the control of the law-making power, and may be withdrawn at its discretion. This view is taken and this distinction asserted in the case of *Richardson* v. *Wicker*, 80 N. C., 172, decided at the last term. It is there held that while the act of 1868-'69, ch. 137, which forbids a sheriff to sell property under execution without first laying off to the debtor so much as is exempted under the constitution of 1868, so far as it relates to debts previously contracted, and increased the exemption, was void, and such additional property remained subject to the debt, yet the act was valid as a repeal of the penalty of $100 imposed upon a delinquent officer by chapter 105, § 25, of the Revised Code, as the right to the amercement constitutes no part of the obligation. The court say : " The im-

position of a penalty for a want of official diligence is a matter of state regulation, and it would be no impairment of the plaintiff's right to collect his debt, if the legislature should repeal the amercement law altogether."

So it has been determined that the right to imprison a debtor and coerce payment thereby, forms no part of the contract, and his discharge does not impair its obligation. *Beers* v. *Haughton,* 9 Peters, 329.

" This court has often decided," says WAITE, C. J., " that statutes of limitation affecting existing rights are not unconstitutional if a reasonable time is given for the commencement of an action before the law takes effect," and cites numerous decisions in support of the proposition. *Terry* v. *Anderson,* 95 U. S., 628.

In *Murray* v. *Charleston,* 96 U. S., 432, the court was called on to expound this provision of the constitution, and its application to a tax levied upon public securities held by a non-resident, and STRONG, J., who delivers the opinion, says: "The obligation of a contract depends upon its terms and the means which the law in existence at the time affords *for its enforcement.* A law which alters the terms of a contract by *imposing new conditions,* or *dispensing with those expressed,* is a law which *impairs its obligation;* for such a law relieves the parties from the moral duty of performing the original stipulations of the contract and it prevents their legal enforcement."

While our researches have not led to the discovery of any adjudicated case directly bearing on the point, nor has such been cited by counsel, our reflections and the reasoning in the cases examined bring us to the conclusion that the penalty is no part of the obligation of a contract, when full legal means of protection and redress are left unimpaired, and that the repealing act effectually withdraws the penalty and leaves the present action without support.

We pass by without comment other interesting points de-

bated before us, such as the capacity of the general assembly, and during the same session, to revise, modify or annul any of its acts of prior legislation, and the liability of the taxable property within the county of Beaufort for penalties incurred by the action of its corporate authorities in the discharge of public duty, as unnecessary in the decision of the case.

We therefore declare that there is error in the record and the action must be dismissed, and it is so ordered.

Error. Action dismissed.