STATE v. JOHN FAGGART.

(Filed 1 December, 1915.)

**Criminal Law—Landlord and Tenant—Trespasser—Claim of Right—Reasonable Belief—Trials—Questions for Jury—Interpretation of Statutes.**

For a conviction under the provisions of Revisal, sec. 3688, for unlawful trespass on lands after being forbidden, it is not alone sufficient to show that the trespass had been forbidden, when there is evidence tending to show that the trespasser peacefully entered under a claim of title, founded upon a reasonable belief that he had the right to go upon the lands; and a peremptory instruction to find the prisoner guilty upon the evidence in this case is held as error, there being evidence that the trespasser had been a tenant upon the lands of the prosecutor, and had entered upon the lands to gather the crops he had sown and cultivated, after he had moved to another place with the intention to return for this purpose, believing he had the right, though forbidden to do so by the prosecutor.

APPEAL by defendant from *Lane, J.,* at August Term, 1915, of CABARRUS.

Indictment for unlawful trespass on land, under Revisal, sec. 3688.

R. A. Barringer, witness for the State, testified: "Some time during the fall of 1913 I rented a farm in No. 9 Township, belonging to me and Maud Barringer, my daughter-in-law, for the two years 1914 and 1915; there were no buildings on the farm at the time I rented the place to John Faggart, and I agreed to build a house and barn on it for him, and did so. Faggart was to pay one-third of what he raised on the place as rent, and there was nothing specified as to what should be planted on any particular part of the land. He was to raise corn, cotton, and small grain, and work the land as he saw fit. He made a fairly good crop of corn and cotton in 1914, and sowed down about 8 acres in oats and wheat in the fall of 1914, while he was still in possession of and living on the land and without objection on my part. The defendant never told me he was going to leave, but I heard some talk to that effect. The first time I knew that the defendant had moved away was some time about 20 January, 1915, when I went to the house and found it empty and the key in the door. I saw defendant some time after that and told him to stay off the place, and, after that the defendant Faggart forbid me to go on that part of the land which he sowed in small grain. I sent him a written notice by my son, James Barringer, forbidding him to cut the wheat and oats or to have any one else to do so for him. On 10 June, 1915, I went with several hands to this field to cut this grain, and found the defendant and his wife and Henry Bost in the field cutting and binding the grain. Faggart and myself had some words about the crop, and he went off and left his wife and Mr. Bost there. I loaded up what he had cut and hauled it home. The defendant later cut the grain with my consent, and I took out claim and

delivery for it and had it threshed, and have it now. It made about 75 bushels of wheat and oats. After the defendant John Faggart moved away I worked about 20 acres in corn and cotton on the place which Faggart had rented."

John Faggart, defendant, testified: "I rented the place from R. A. Barringer for two years, 1914 and 1915, and was to give one-third of the crops raised by me on the land as rent. There was nothing said as to what I was to raise on the land—just a general crop. Mr. Barringer agreed, at the time he rented the land, to build a house on it for me to live in and a barn which was to be shedded in front and behind, and also agreed to make a good big pasture, ample for my cattle. Mr. Barringer built the house so it did very well, but not according to contract, and I made no complaint about the house; he put up the frame of a barn and weatherboarded it up a little above the joists and left it open from there up, except a few planks nailed around above, some distance apart, and did not build any shed at all, and on that account my wagon and some of my rough feed had to stay out in the weather and was damaged; and some of my feed that was put in the barn was damaged because the barn was not finished and shedded according to contract. Barringer fenced in 4 or 5 acres, most of old pine field, for a pasture, which was eaten out in a week or two by one cow, and I was forced to get pasture from other parties for my cattle, because Barringer did not make a pasture as he contracted to do. I made a fairly good crop of corn and cotton during 1914 and I sowed about 8 acres of wheat and oats in the fall. I expected to stay on and work the place the second year, and would have done so if Mr. Barringer had complied with his contract and built the barn and pasture as he had agreed to do. I told James Barringer, R. A. Barringer's son and Maud Barringer's husband, some time in December, 1914, before I rented another place, to tell his father, if they didn't build a shed to the barn, as they had promised, that I was going to leave, for I could not stay there unless I had some way to take care of my stuff. I moved away some time about 20 January, 1915, and had not been back until about the 10th of June, when I went back with hands to harvest the crop, etc. I had already forbidden Barringer to go on the land. I had no intention of abandoning my crop of wheat and oats, and had not done so. I had sowed the crop and had done all to it that had been done, and when it got ripe I thought that I had a right to harvest the crop and get my part of it, and went there for that purpose. I moved away and didn't cultivate the land the second year, because Mr. Barringer did not do what he contracted to do about the barn and pasture, and I could not afford to stay there and have no pasture and no way or place to take care of my crop after I made it. I rented a place from Mr. Crawford Ross and moved there 20 January, 1915, and worked a crop of cotton and corn this year on Mr. Ross's place."

Mrs. John Faggart testified: "I am the wife of the defendant, and was present when the contract was made. Mr. Barringer agreed to build the house, to build and shed the barn, and to make a large pasture, enough for the cattle. We had two cows, and the pasture he made was not enough for one but a few weeks, and we had to get pasture from our neighbors most of the summer. We lost some feed because Mr. Barringer never built the barn as he agreed to do. We left the place because Mr. Barringer did not fulfill his contract, and we could not afford to stay there another year without pasture for our cows and a place to house our feed. It was too hard on me to take our cows a half mile away to somebody else's pasture, and, besides, he had agreed to furnish us plenty of pasture and didn't do it, and we did not want to stay unless he did."

James Barringer, witness for the State, testified: "I am the son of R. A. Barringer and the husband of Maud Barringer, who owned this land. I was not present when the contract was made, nor when my father and others went to the field to cut the grain. When I got to the field where they were, John Faggart was not there, but his wife and Mr. Bost were there. I delivered the notice, or a similar one, to the defendant." Notice forbidding the defendant to go on the land to cut the grain, or to have any one do so, dated prior to 10 June, 1915, with R. A. Barringer's name signed to it, was offered in evidence.

The court instructed the jury that if they believed the defendant's own evidence, to return a verdict of guilty, he being guilty on his own statement. There was a verdict of guilty, and from the judgment thereon defendant appealed.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*H. S. Williams for defendant.*

WALKER, J., after stating the case: The statute under which this indictment was drawn has been the subject of much consideration by this Court. It was thought, until the decision in *S. v. Bryson,* 81 N. C., 505, that the meaning of the Legislature was quite well understood, and that the law was enacted to keep off intruders or interlopers, and not to punish those who, in good faith and under claim of right, had entered upon land. It was held very soon after the adoption of the statute that where one, having no legal right, entered upon land under a claim of such right, and in good faith, the act of entry was not within the mischief of the statute, though within its words. *S. v. Hanks,* 66 N. C., 613; *S. v. Roseman, ibid.,* 634; *S. v. Ellen,* 68 N. C., 281; *S. v. Hause,* 71 N. C., 518; *S. v. Crosset,* 81 N. C., 579. In those cases we approved what was held in *Dotson v. State,* 6 Coldwell (Tenn.),

p. 545, in regard to a statute similarly worded: "If one commit a trespass upon the land of another, his good faith or ignorance of the true right or title will not exonerate him from civil responsibility for the act. But when the statute affixed to such a trespass the consequence of a criminal offense, we will not presume that the Legislature intended to punish criminally acts committed in ignorance, by accident, or under claim of right, and in the *bona fide* belief that the land is the property of the trespasser, unless the terms of the statute forbid any other construction." And again, at p. 548: "We think that to authorize a prosecution of this nature there must be something more than a mere technical trespass upon the land. The trespass must be committed willfully and knowingly." In *S. v. Bryson,* 81 N. C., 595, the Court held that the defendant must have acted *bona fide,* under a claim of right to enter, but that he must also have had reasonable ground for his claim and his belief that he had the right. The Court said: "If a party be indicted for a trespass on land, and in the proof there be no evidence of a claim of title, or of such facts and circumstances upon which he could reasonably and *bona fide* believe he had a right to do what he did, the court will not submit an inquiry to the jury as to a mere abstraction; and therefore we hold there was no error in the refusal to charge the jury as requested." It will be seen by careful attention to the facts of that case that there the defendant had not the semblance of a right to enter upon the land, and no reasonable man could have thought that such a right existed. He once had a bare license to cross the land along a path or way, but this privilege, which he must have known was revocable at the will of the owner, was withdrawn by him, and the entry was thereafter made. This was a clear case of willful entry, and it could not have been *bona fide,* under a claim of right; and so are the cases which have followed that decision. The facts in them showed, on their face, that there was not room for even a pretense of right, nor any ground upon which to base an honest claim. The *Bryson case* is reviewed by the Court in *S. v. Whitener,* 93 N. C., 590, *Justice Ashe* delivering the opinion with his accustomed clearness and precision of statement, and it is distinguished from the cases which preceded it by reason of its special facts, and the principle of the decision, thus limited, is not applicable to this case. In *S. v. Wells,* 142 N. C., 590, *Justice Hoke,* for the Court, said: "Defendant prosecuted under section 3688, Revisal 1905, which makes it a misdemeanor for one to enter on the land of another after being forbidden, cannot be convicted if he enters having right or under a *bona fide* claim of right. *S. v. Crosset,* 81 N. C., 579; *S. v. Whitener,* 93 N. C., 590; *S. v. Winslow,* 95 N. C., 649. True, we have held in several well considered decisions that when the State proves there has been an entry on another's land after being forbidden, the burden is on the defendant to show that he entered under a license from the owner,

STATE *v.* FAGGART.

or under a *bona fide* claim of right. And on the question of *bona fides* of such claim the defendant must show that he not only believed he had a right to enter, but that he had reasonable grounds for such belief. *S. v. Glenn,* 118 N. C., 1194; *S. v. Durham,* 121 N. C., 546. But where there is evidence tending to show that the defendant believed and had reasonable ground to believe in his right to enter, then, in addition to his right, the question of his *bona fide* claim of right must be in some proper way considered and passed upon before he can be convicted. The judge finds, and we agree with him, that the defendant entered without right, but the question of whether he entered upon a *bona fide* claim of right does not appear in the facts, and has never been determined. The defendant's guilt, therefore, has not been established, and the judgment against him must be set aside."

If the party who enters upon the land has a legal right to do so, there could be no question of his innocence; it is only where he has no such right that this statute applies. If he has the legal right, and enters forcibly and violently or with a strong hand, in a way tending to cause a breach of the peace, he would be guilty of forcible trespass, or forcible entry, as the case may be, at common law, and also be liable to a civil action for damages; but when he enters without force, while he may be liable civilly for damages because of the wrong committed by him, as where he did not have the legal right to enter, he is not criminally liable under the statute if his entry was made under a claim of title, founded upon a reasonable belief that he had the right to go upon the land. *S. v. Whitener, supra.* In this case it appears that the parties, prosecutor and defendant, were disputing as to the right of entry, the former contending that defendant had fully abandoned the premises, including the wheat field, and the defendant insisting that he had not done so, and that he vacated the land temporarily because the prosecutor had not complied with his contract, and that by reason thereof the condition of the premises was such that he could not stay there. He notified the prosecutor that he must not take possession of the wheat field or cut the wheat, and he was forbidden by the landlord to come upon the land.

There is some evidence from which a jury might infer that defendant intended to return and cut the wheat. He lived on the land the first year and made a good crop, and would have remained on that part of it where the houses were had the prosecutor made it tenantable, as he had promised to do. He was bound to leave and seek another house in order to get proper shelter for his family and his stock, and this was caused by the landlord's wrongful act.

When the defendant first cut the wheat the prosecutor hauled it away, but finally consented that defendant might continue the cutting, and then he appropriated all the wheat.

We do not think this case is within the principle of *S. v. Bryson,* 81 N. C., 595, and the cases which have followed it, but that it is governed by the rule, as applied in the other cases, where the question of the defendant's guilt was held to be one for the jury to decide, under proper instructions of the court. We do not think it was so unreasonable for the defendant to suppose that, under the circumstances, he had the right to go upon the land, when the crop matured, and cut the wheat, especially as the prosecutor had not complied with his contract, and compelled him to obtain shelter elsewhere. The facts might reasonably impress him with the belief, unlearned in the law as he was, that he had the right to gather what he sowed. We do not hold that he had a legal right to return to the land and cut the wheat. It is not necessary to do so, but we do not think the facts justified the peremptory instruction that defendant was guilty on his own statement, and the question of good faith and reasonable claim must be submitted to the jury. We consider the case quite as strong for defendant as some of those decided by this Court, and above cited, where a similar conclusion was reached.

The original fault was with the prosecutor, who, by his failure to perform the contract, made that part of the land where defendant lived untenantable and compelled him to seek another home, though there is evidence that he did not intend to abandon his right to return and cut the wheat and oats. Being a layman, he might reasonably have thought that he had properly reserved this right owing to the prosecutor's conduct in compelling him to leave, however the law may be.

New trial.