G. F. PARROTT AND WIFE v. ATLANTIC AND NORTH CAROLINA RAILROAD COMPANY AND NORFOLK SOUTHERN RAILROAD COMPANY.

(Filed 8 April, 1914.)

1. Railroads — Contracts—Easements—Flag Stations—Specific Performance—Public Policy—Issues—Limitation of Actions—Abandonment—Trials—Evidence.

In 1859 the defendant railroad company acquired a right of way over the lands of the plaintiff's ancestor in consideration of stopping its trains upon being signaled, at a flag station thereon, which in two years was entered upon and continuously used by the company and its lessee road, under a sealed and registered instrument of writing, to within a short time previous to the commencement of the action, when the lessee road refused to continue the arrangement upon the ground that it interfered with its duties to the public: *Held*, (1) the right acquired by the owner ran with the land, and the lessee road was bound to the performance of the contract, unless public policy had intervened; (2) whether the interests of the public now require the discontinuance of the flag station is for the determination of the jury, with the burden of proof on defendant; (3) except where the rights of the public intervene, specific performance of the contract by the company will be decreed; (4) the consideration for the right of way continued with its use, and the contract was not of uncertain duration; (5) in this case the statute of limitations had not run, and there is no evidence of abandonment by the owner.

2. Railroads — Easements—Flag Stations—Contracts—Specific Performance—Decree—Corporation Commission—Damages.

In this suit by the owner to enforce specific performance of a contract made with a railroad to stop its trains at a flag station

on plaintiff's lands, in consideration of which the plaintiff had granted a right of way thereon, it is *Held*, that should the issue as to public policy be found against the company, the decree for specific performance should contain a provision that the defendant shall not be estopped thereby to institute proceedings at any future time, should conditions materially change, under Revisal, 1098, before the Corporation Commission, subject to appeal, etc. As to whether the plaintiff may recover damages for breach of contract when specific performance thereof is denied him, *Quære.*

### 3. Corporation Commission—Stations—Contracts.

Revisal, 1097 (1), providing that a railroad company may not be required by the Corporation Commission to establish a flag station within 5 miles of one already existing, has no application to the facts of this case, in which a valid agreement to maintain the station on the part of the railroad had been made in 1859, and had since been continuously complied with and the right of way enjoyed by it.

ALLEN, J., concurring; BROWN and WALKER, JJ., dissenting.

APPEAL by defendants from *O. H. Allen, J.,* at November Term, 1913, of LENOIR.

*Loftin & Dawson and G. V. Cowper for plaintiffs.*
*Rouse & Land and J. K. Warren for defendants.*

CLARK, C. J. On 31 March, 1859, James M. Parrott, father of the plaintiff, George F. Parrott, and the Atlantic and North Carolina Railroad Company, entered into a contract under seal by which said James M. Parrott granted to said railroad company the right of way through his lands in the county of Lenoir in consideration of the agreement therein that said railroad company should establish a flag station where its track crossed the avenue running from Parrott's dwelling, and that upon proper notice passengers and freight would be put off and taken on at said flag station. This was within two years of the completion of the railroad through said lands. This contract was duly recorded in the office of the register of deeds of Lenoir County, where the land lies.

The jury finds that the contract was acted on up to within less than twenty years of the beginning of this action, but that

the defendant Norfolk and Southern Railroad Company, which is now operating the franchise of Atlantic and North Carolina Railroad Company (under a lease whereby it undertook to discharge all the contracts and duties of the lessor company), in 1910 refused to continue the flag station at this point, on the ground that it had since established a regular station within 2 miles of said flag station.

This action was brought for specific performance. The defendants pleaded that the right had been abandoned and was barred by the statute of limitations, and, furthermore, that it was against public policy, and its execution will seriously interfere with the performance of its duty as public carrier and will seriously inconvenience and retard the handling of freight and passenger trains over said railroad, and, further, that under the law they could not be compelled to establish a station at that point.

The defendants also contend that the plaintiffs' relief should be sought by a proceeding before the Corporation Commission.

If this were a proceeding to require the establishment of a station or a flag station at said point, the relief would be sought before the Corporation Commission, and in such case a new station cannot be required within less than 5 miles of one already existing. Revisal, 1097 (1). But here the plaintiffs are seeking to enforce a contract which was valid when made, and which was recognized and acted upon for a long number of years, and as to which the defendants are not shown to have made any denial till 1910.

It is very clear, therefore, that the right is not barred by any statute of limitations, and there is no evidence of abandonment. Neither was the contract against public policy.

The validity of such contract is upheld in *Taylor v. R. R.*, (Fla.) 16 L. R. A. (N. S.), 307, and in *R. R. v. Camp*, (Ga.) 15 L. R. A. (N. S.), 594; *s. c.,* 14 A. and E. Anno. Cas., 439, with full citation of authorities in the notes to those cases. In the note to the latter (p. 441) it is said: "It is a well settled rule that a contract by a railroad to locate its station at a certain point or place or within certain limits, which does not pro-

hibit or restrict the location of any other station, is not contrary to public policy, and is valid and enforcible." Then follow numerous citations to that effect.

. It is held in these cases that upon such contract the company may be compelled "to maintain the station and schedule unless the public interests may require their discontinuance, and the other party to the contract has a right of action for damages for the breach ,of-such contract." The other party took the con- ·tract with the knowledge that the increase in the business of the carrier might in course of time require the cessation of the station at such point; and, therefore, should the defendant prove in this case that the handling of its trains is seriously interfered with by the continuance of the rights of the plaintiffs, then the court will not decree specific performance; but the burden is upon the defendants to prove such state of facts. If the jury should so find, then, since the carrier retains the consideration, the jury should also assess the damages which the plaintiffs will sustain by their loss of the rights they have under the contract.

The court properly refused the ninth issue tendered by the defendants, "Is there any reasonable public necessity for, or benefit to be derived from, the said proposed station?" We may note that the word "proposed" was not pertinent, for the plaintiffs are not seeking to "establish" a station, but are demanding specific performance of the contract under which the flag station had been established.

The court, however, erred in refusing the eighth issue, "Will the said station impede, retard, or interfere with the defendants in the performance of their duties to the public in the carriage of freight and passengers?" and also in excluding evidence in support of such issue.

For these errors there must be a new trial. Should the jury find this last issue in the negative, then there should be a decree for specific performance; but it should contain a provision that the defendants shall not be estopped thereby to institute a proceeding at any future time, should conditions materially change, under Revisal, 1098, before the Corporation Commission, subject to appeal to the Superior Court and the ascertain-

PARROTT *v.* R. R.

ment of damages accruing to the then owners of the land, for permission to abandon the continuation of the flag station at that point, by reason of the increased business which shall then be found incompatible with the longer maintenance of the station without detriment to the duties due the public in handling its trains.

The authorities that a contract of this kind is enforcible by a decree for specific performance, unless its further exercise, by reason of changed circumstances, becomes detrimental to the public interests, and that in such case the plaintiff is entitled to recover damages, are so numerous and compelling that it is unnecessary to do more than to refer, as we have done, to the large number of cases cited in the notes to 15 L. R. A., 594; 16 L. R. A., 307, and 14 A. and E. Anno. Cas., 441.

*Solomon v. Sewerage Co.,* 142 N. C., 439, is entirely different from this case. There the plaintiff had made an agreement with the sewerage company to pay it $2 per year rental, without specifying any duration for the contract. It was held that by reason of the increased cost of the service, the sewerage company, having raised its rates, was compelled to charge the plaintiff the same rental it charged others; besides, in that case, there was no duration specified for the contract. This case would have been like that if there had been an agreement by this defendant to charge certain rates and fares to the plaintiff's flag station, and subsequently the charges of the carrier had been raised as to other persons. In such case the plaintiff could not require specific performance of charging less rates to that station than to others, and there being no duration expressed in the contract, he could not exact damages for the breach. But here the defendant received a sum certain, once for all, *i. e.,* the right of way across the Parrott land, and it still retains that consideration. In return therefor it must comply with its contract to give the facilities of a flag station at that point, unless and until it becomes detrimental to the public in handling the business of the road. And in such case it must return to the plaintiffs the consideration which it still holds and hourly en-

joys. As it cannot, of course, surrender the right of way, it must in such case pay damages in lieu thereof.

The easement runs with the land. If the right of way was surrendered or abandoned, the owners of the land through which it runs would hold it freed of such burden. As it is, they hold their land subject to the burden. In *Norfleet v. Cromwell,* 64 N. C., 1, the subject of easements is fully discussed, and it is held that such covenants *"run with the land,"* even as against assignees in fee. To same effect, *Herring v. Lumber Co.,* 163 N. C., 486; *Gilmer v. R. R.,* 79 Ala., 569; *Whalen v. R. R.,* 108 Ind., 1.

The defendant railroad acquired this easement in the Parrott land, and as sole compensation therefor contracted to give Parrott a flag station at that point. This is not a contract of uncertain duration, for the defendant received the right of way, and its assignee still holds and uses it, and it must render the agreed compensation, unless, as we have said, it becomes injurious to the operation of the road, and then it must pay its value.

This was not a personal contract with Parrott, for if it were, his assignee of the land might at any time have put an end to the easement and have required its abandonment by the railroad. On the other hand, if Parrott had died the following week, the railroad would have gotten the easement for nothing.

The railroad company, in exchange for the detriment to the land and of the benefit to themselves by reason of the right of way over the land, contracted to give the facilities of a flag station at that point, and the present owners of that part of the land through which the defendant's tract runs are entitled to enforce the agreed compensation of having a flag station at that point, except in the event, as above stated, of its termination being adjudged by reasons of public policy.

We do not find any error as to the issues which have been found, and the finding as to them is sustained. But the case will go back for the submission of the following issues: "Would the continuance of the flag station impede, retard, or interfere with the defendants in the performance of their duties to the

public in the carriage of freight and passengers?" And the further issue, "If so, what damages will the plaintiffs sustain by the cessation of the flag station?"

The costs in this Court will be divided.

Partial new trial.

ALLEN, J., concurring: The defendant is using and claiming a right of way about a mile in length, under a deed executed by the ancestor of the plaintiff, and under· whom the plaintiff claims, and the sole consideration for the deed, as expressed therein, is the promise and agreement that trains running along this right of way shall, upon notice, stop at a platform erected and maintained by the owner of the land, and it would seem to be unjust to permit the defendant to retain the right of way and at the same time repudiate the agreement, which it proposes to do.

I concur in the opinion of the Court, that the agreement is valid and enforcible in a court of equity, because it is not exclusive and does not limit the power of the defendant to locate and relocate depots; and I agree fully in the opinion expressed by *Mr. Justice Brown,* that "it seems to be universally well settled that contracts undertaking to obligate a railroad company to establish its depot *exclusively* at a particular point are void as against public policy." (The italics are mine.)

The case of *R. R. v. Sumner,* 106 Ind., 59, classifies contracts of this character and clearly points out the distinction between those that are valid and those that are invalid. The Court says:

"Covenants of the character in question, so far as they have been the subject of judicial interpretation, are of three classes:

"1. There are those which stipulate for the location of stations or depots at particular places, and which prohibit the location of others within prescribed limits. All such as contain restrictive stipulations by which the railway company undertakes to prohibit itself from thereafter erecting other stationhouses or depots within prescribed limits are uniformly held to be void, as being violative of public policy. Railroad corporations are regarded as public agencies, owing duties to the public

generally. Accordingly, they can make no contract which shall prohibit them from serving the public as the future demands of business or concentration of population may require. . *Williamson v. C. R. I. and P. R. R. Co.,* 53 Iowa, 126 (36 Am. Rep., 206); *St. Louis, etc., R. R. Co. v. Mathers,* 104 Ill., 257; *St. Louis, etc., R. R. Co. v. Mathers,* 71 Ill., 592 (22 Am. Rep., 122); *St. Joseph, etc., R. R. Co. v. Ryan,* 11 Kan., 602 (15 Am. Rep., 357).

"2. Another class consists of those cases in which an officer or other person supposed to be influential with a railway company, for a consideration promised him, agrees to secure the location of a station, depot, or railway at a particular place. A conspicuous case in this class is *Fuller v. Dame,* 18 Pick., 472. All such contracts are void as against public policy. *Bestor v. Wathen,* 60 Ill., 138; *Linder v. Carpenter,* 62 Ill., 309.

"3. Still another class is that to which the case under consideration is allied. Such are the cases in which an agreement has been made, between an individual and a railway corporation, for the location of a station or depot at a particular place, in consideration of a donation of money or property to the corporation, without any restriction or prohibition against any other location. No case has been brought to our notice in which this question was involved, and the decision of which was not controlled by other considerations, which condemns such an agreement. On the contrary, it has been held that an agreement to pay a railway company a stipulated sum in consideration that it would locate its route at a particular place is valid, and may be enforced. *Cumberland R. R. Co. v. Baab,* 9 Watts, 458; *First National Bank v. Hendrue,* 49 Iowa, 302 (31 Am. Rep., 153). So a conditional subscription of stock is valid. *New Albany, etc., R. R. Co. v. McCormick,* 10 Ind., 499; *Jewett v. Lawrenceburgh, etc., R. R. Co.,* 10 Ind., 539. A voluntary grant to a railroad, on condition that it would locate its route and establish a depot at a certain place, was sustained as not being in contravention of public policy. *McClure v. Mo. Riv., etc., R. R. Co.,* 9 Kan., 373."

PARROTT *v.* R. R.

The quotation by *Mr. Justice Walker* in *Edwards v. Goldsboro,* 141 N. C., 70, from *People v. R. R.,* 130 Ill., 184, "that contracts materially limiting their power to locate and relocate depots are against public policy, and therefore void," condemns contracts of the first class, and the case of *Fuller v. Dame,* 35 Mass., 473, belongs to the second class, as in this last case the action was on a note given to Fuller, who was one of the proprietors of the railroad, in consideration of his promise to induce the railroad to establish a depot at a particular place.

In *R. R. v. State,* 31 Fla., 508, there was no contract, and the action was to compel the establishment of a depot for public convenience; in *Wilson v. R. R.,* 99 F. R., 645, the contract was to establish a depot, and that no other should be established within a certain distance; in *Holliday v. Patterson,* 5 Ore., 177, the contract was to pay the plaintiff, who owned a controlling interest in the road and was a director, certain sums if a different and more expensive route should be adopted than the one surveyed; in *R. R. v. Mathers,* 71 Ill., 598, the contract required the establishment of a depot at Ashland, and provided that no other depot should be established within 3 miles of that place; in *R. R. v. Seely,* 45 Mo., 222, the contract was to establish a depot on several considerations, and among others, a conveyance of lands for speculative purposes; in *R. R. v. People,* 132 Ill., 183, there was no contract, and the action was to prevent a change of depot; in *Marsh v. R. R.,* 64 Ill., 415, the contract was to locate at a certain place and at no other in town; in *R. R. v. Mathers,* 104 Ill., 257, the contract was to locate a depot and no other within 3 miles.

In these cases, where there were contracts, they were held invalid because they contained limitations upon the power to establish other depots, or on account of speculative provisions or inducements to officers of the railroads to have routes or depots established at certain places. The contract before us contains no such stipulation, and such contracts have almost without exception been held to be valid and enforcible. *Bank v. Ayers,* 12 Wis., 517; *Gray v. R. R.,* 189 Ill., 408; *R. R. v. Miller,* 31 Mo., 20; *Chamberlain v. R. R.,* 15 Ohio St., 248; *Harris*

*v. Roberts,* 12 Neb., 634; *R. R. v. Robards,* 60 Tex., 549; *R. R.
v. Dowson,* 62 Tex., 260; *Matterson v. R. R.,* 74 Pa. St., 215;
*R. R. v. Parks,* 86 Tenn., 229; *Herzog v. R. R.* (Cal.), 17 L. R.
A. (N. S.); *Griswold v. R. R.,* 12 N. D., 441; *R. R. v. Camp,*
130 Ga., 1; *Lyman v. R. R.,* 190 Ill., 321; *R. R. v. Sumner,* 106
Ind., 59; *Gilmer v. R. R.,* 79 Ala., 572; *Whalen v. R. R.,* 108
Ind., 11.

In the note to the case from Georgia, reported in 14 A. and E.
Ann. Cases, 441, the cases are collected and classified, and the
editor says: "(1) It is a well settled rule that a contract by a
railroad to locate its station at a certain point or place or within
certain limits, which does not prohibit or restrict the location
of any other station, is not contrary to public policy, and is
valid and enforcible. The rule stated above is so well settled
that in many cases the validity of such contracts has not been
questioned, but has apparently been conceded by the litigants
and recognized by the courts. See the following cases: . . .
(2) Contracts that materially limit the power of a railroad com-
pany to locate and relocate its stations are against public policy,
and therefore void. Accordingly, in all cases where a railroad
company agrees with an individual to preclude itself from estab-
lishing or locating depots or stations on its roads at any other
than certain localities, or within certain prescribed limits, such
agreements are void. (3) Another class of void agreements re-
specting the location of stations are those whereby a private
individual or an officer or agent of a railroad company, under
an assumption of influence with that corporation, agrees for a
consideration to secure from the corporation the location of sta-
tions or depots in a particular locality."

The next question presented is, whether such contracts can be
enforced in a court of equity by specific performance. If the
contract belongs to the first or second class mentioned in the
Indiana case, it is void, and a court of equity cannot aid it; but
if it belongs to the third class, performance will be enforced.
*Lytton (Sir Edward Bulwer) v. R. R.,* 69 Eng. R. Reprint, 836;
*Herzog v. R. R.,* 17 L. R. A. (N. S.), 429; *Taylor v. R. R.,* 54

Fla., 638; *McCowen v. Pew,* 153 Cal., 741; *Lawrence v. R. R.,*
36 Hun., 474, approved in *R. R. v. R. R.,* 144 N. Y., 153.

In *Taylor v. R. R., supra,* the contract was to maintain a
spur track and depot, and to stop regular passenger trains at a
certain point in consideration of the conveyance of a right of
way, and it was held that the plaintiff was entitled to specific
performance; the Court, speaking through *Mr. Justice Whit-
field,* saying: "It is the duty of a common carrier railroad cor-
poration to have regard for the rights of the public in the serv-
ice it engages to perform under the franchises the State permits
it to use primarily for the benefit of the public. This require-
ment embraces the duty to render a service adequate to meet all
the just requirements of the public, including reasonable dis-
patch, convenience, regularity, and promptness in the trans-
portation of passengers, provision and maintenance of adequate
depot facilities suited to the business and convenience of the
communities along the road, and the performance of the duties
and the rendering of the service due to the public, without un-
just discriminations of any character as to persons, localities, or
conditions. This duty, however, does not relieve the corporation
from its contract obligations to individuals when an observance
of the obligations does not materially and injuriously affect the
rights of the public. It is the duty of the corporation to observe
the obligation of its contracts with individuals that are made in
good faith, and that do not necessarily, directly, and materially
affect injuriously substantial rights of the public, until the cor-
poration is relieved from such contracts by due course of law.
. . . The defendant appears to have asked for and received
in kind the property and advantages from the complainants
under the contract, and promised in consideration thereof to
perform its stated undertakings. Under the facts alleged it is
*prima facie* equitable that the complainants should have the
benefit of a performance by the defendant of the agreement on
its part in the manner and to the extent agreed on, at least in
the absence of a proper showing of superior rights of the public
against the corporation as a common carrier. . . . While

165—20

equity will not ordinarily decree the specific performance of contracts requiring continuous acts involving skill, judgment, and technical knowledge, contracts relating to the operation of railroads have been specifically enforced in a number of cases. Where a railroad company, in consideration of the conveyance to it of land, makes a reasonable agreement to perform, in return for such conveyance, certain service that is fairly within its corporate powers and purposes and that is not essentially inconsistent with the company's duty to the general public, such agreement, if not otherwise illegal or unenforcible, will be specifically enforced in equity upon proper allegations and proofs."

This case from Florida is reported in 14 A. and E. Ann. Cases, 472, and in the note the authorities are collected and the comment is made that, "Although there are but few cases wherein specific performance of a contract by a railroad to erect a depot or station has been actually decreed, it is generally recognized that a contract between a railroad company and a landowner whereby the landowner conveys certain land in consideration of an agreement by the railroad company to erect and maintain a suitable depot may be enforced in equity."

The case of R. R. v. Marshall, 136 U. S., 393, is not in conflict with these authorities. In that case the city of Marshall conveyed certain land and other property to the railroad in consideration of an agreement to make Marshall a terminus of the road and to locate and maintain its machine and car shops there, and the action was brought to prevent the removal of the shops after their erection. The city of Marshall contended that the contract required the railroad to maintain the shops permanently, and that it could not remove them, although required by the public interest; and it was in reference to this contention that the Court said: "But we are further of opinion that, if the contract is to be construed as the appellant insists it should be construed, it is not one to be enforced in equity," and that the remedy for the violation of such a contract is an action at law to recover damages.

In Conger v. R. R., 120 N. Y., 32, specific performance was denied, but on the peculiar facts of the case, the Court saying

in explanation of its judgment and in recognition of the right
to the equity in a proper case: "As we have seen, the Long
Clove gorge is located upon the side of a steep mountain, in a
sparsely settled district, and is approached by a steep grade, and
that a passenger station with an approach thereat could be con-
structed only at a considerable expense.   These are reasons
worthy of consideration; but if there were no others, the trial
court might not have deemed them sufficient to refuse specific
performance.   But they are followed by another, which gives
additional force and weight, and that is that public travel will
be delayed by the stoppage of trains, and that the public con-
venience will not be promoted."

In *Carp v. R. R.,* 7 Ont., 332, the right to specific perform-
ance was also denied on account of peculiar conditions.

If the contract is valid and enforcible in equity, can the
plaintiff, who holds under the original grantor, maintain this
action?   And this depends on whether the agreement·or cove-
nant is personal or one running with land.

In *Gilmer v. R. R.,* 79 Ala., 569, it was held that "A covenant
by a railroad corporation, in consideration of a grant of the
right of way through plaintiff's lands 50 feet wide on each side
of the track, to erect a 'flag station' at a point convenient to his
house, to permit him to cultivate all the land embraced in the
grant which was not needed for use by the railroad company,
and if a depot was built, not to permit the sale of ardent spirits
on the premises, runs with the land," and in *Whalen v. R. R.,*
108 Ind., 11, in which the plaintiff was not the original grantor,
that covenants (1) to construct and maintain a turn-out and
siding at a certain place, (2) to take up and set down at said
siding by its passenger cars all persons going to and from the
farm, were covenants running with the land; and I think there
is no authority in this State opposed to this view, and I have
found none elsewhere.

This seems to me to be in accord with reason and right.

The defendant is in the enjoyment of a right of way or ease-
ment across the land of the plaintiff, the title to the fee being
in the plaintiff.   This easement can be conveyed from time to

PARROTT *v.* R. R.

time, and rests as a burden on the land in the hands of successive, owners, and the same deed which passes the easement contains the agreement or promise which is its price.

Both go hand in hand—the easement and the promise—and are continuous in their nature.

I am, therefore, of opinion that the contract is valid and enforcible in equity, and that the plaintiff may maintain this action, but that his right is subject to the proper performance of the duties the defendant owes to the public. How far this idea of private rights yielding to public necessity, frequently without compensation, ought to go, is a question of serious moment, but it pervades all departments of the law. The tendency is to destroy individuality, and to deal with men *en masse,* which may not conduce to the public good.

I do not express an opinion as to the right to recover damages in that event, as the question is not before us.

BROWN, J., dissenting: I am compelled to enter my dissent to the opinion of the Court because in my judgment it is contrary to the decisions of this Court, as well as against the overwhelming weight of authority.

This action is brought to compel specific performance of a contract made 31 March, 1859, between James M. Parrott, the plaintiff's ancestor, and the Atlantic and North Carolina Railway Company, the material part of which contract is as follows:

"And in the second place, the said railroad company covenants and agrees with said James M. Parrott, his heirs, executors, and administrators, that the passenger trains run, and hereafter to be run, on said road shall, on due notice being given, stop at the platform to be erected according to the subsequent terms of this agreement, for the purpose of landing and of reception of passengers and baggage, and that whatever freight may be hereafter directed and destined to said place where said platform is to be erected any freight train shall stop at said platform for the delivery of the same, and the said freight trains shall also, on due notice being given, stop at said platform for the reception of such freight as may be there ready for transportation."

The motion to nonsuit should be granted.

1. The contract is against public policy and void.

In *Edwards v. Goldsboro,* 141 N. C., 70, this Court said: "The question has frequently arisen in the establishment of railroad depots. Railway companies are *quasi*-public corporations, and it has been said that the public have an interest in the location of their depots, the public convenience and accommodation being involved. It is in recognition of the paramount duty of railway companies to establish and maintain their depots at such points and in such manner as to subserve the public necessities and convenience, that it has been held by all courts, with very few exceptions, that contracts materially limiting their power to locate and relocate their depots are against the public policy, and therefore void.

"It seems to be universally well settled that contracts undertaking to obligate a railroad company to establish its depot exclusively at a particular point are void as against public policy. Cases and text-books to the same effect can be cited numerously. We give only a few of them: *R. R. v. State,* 31 Fla., 508; *R. R. v. Ryan,* 11 Kan., 602; *R. R. v. Seeley,* 45 Mo., 212; *R. R. v. People,* 132 Ill., 559; *R. R. v. Marshall,* 136 U. S. Supreme Court, 393; *R. R. v. Louisville,* 71 Ky., 417; *Holladay v. Patterson,* 5 Oregon, 177; *Marsh v. R. R.,* 64 Ill., 414; Greenhood on Public Policy, 319; 2 Beach on Contracts, sec. 1517."

This opinion of *Mr. Justice Walker,* delivered as late as 1906, was approved by a unanimous Court, and is cited and followed in subsequent cases: *Solomon v. Sewerage Co.,* 142 N. C., 449; *Smathers v. Insurance Co.,* 151 N. C., 103; *Floyd v. R. R.,* 151 N. C., 540.

The validity and feasibility of such contracts should not be submitted to a jury. "When a contract belongs to a class which is reprobated by public policy, it will be declared illegal, though in that particular instance no actual injury may have resulted to the public, as the *test* is the evil tendency of the contract, and not the actual result." 15 A. and E., 934; *Edwards v. Goldsboro, supra; Glenn v. Commissioners,* 139 N. C., 412; *Bridge Co. v. Commissioners,* 81 N. C., 491.

In addition to the above cases, see *People v. C. and A. R. R.,* 130 Ill., a very strong opinion fully sustaining this opinion and approved in *Edwards v. Goldsboro, supra.  R. R. v. Mathers,* 71 Ill., 592, and 104 Ill., 257; Taylor on Corporations, sec. 162, and authorities cited.

In *Woodley v. Telephone Co.,* 163 N. C., 284, this Court says: "Our decisions are to the effect that these public-service corporations, including telephone and telegraph companies, take and hold their charters subject to the obligations of rendering service at uniform and reasonable rates and without discrimination, and, further, that they have no right to make or to continue in the performance of a contract which renders them unable to perform the duties imposed upon them by their charter, and whether such contract is evidenced by municipal ordinance or by agreement between the parties."

In Clark on Contracts, on page 424, the author says: "Railroad and other common carriers, for instance, are regarded to some extent as public servants, and it is contrary to public policy for them to make any agreement whereby they may be hindered in serving the public.  For this reason, most courts have refused to uphold subscriptions or other contracts with railroad companies under which they bind themselves to build their road along a particular route or to locate their station or depot at a particular point or not at a particular point."

This subject was fully considered by *Chief Justice Shaw* in *Fuller v. Dame,* 35 Mass., 473.  It was an action of assumpsit on a note given in consideration of an agreement to locate a railroad station on certain land of payee, and although the station had been erected, the Court held that the note was not enforcible, because against public policy.

This is a leading case and has been almost universally approved and followed.  In that case the Court says:

"The work is a public work, and the public accommodation is the ultimate objection.  In doing this, a confidence was reposed in them, acting as agents for the public—a confidence which it seems could be safely so reposed, when it is considered that the interests of the corporation as a company of passenger and

freight carriers, for the profit was identical with the interests of those who were to be carried—that is, the public interest.

"This confidence, however, could only be safely so reposed under the belief that all of the directors and members of the company should exercise their best and unbiased judgment upon the question of such fitness without being influenced by distinct and extraneous interests, having no connection with the accommodation of the public or the interests of the company.

. "Any attempt, therefore, to create and bring into efficient operation such undue influence has all the injurious effects of a fraud upon the public, by causing a question which ought to be decided with a sole and single regard to the public interests, to be affected and controlled by considerations having no regard to such interests. . . . It is obvious that if one large landholder may make a valid conditional promise to pay a large sum of money to a stockholder, or influential citizen, on condition that a work of great public improvement may be so fixed as to enhance the value of his estate, all other great landholders may make like promises, on similar conditions, and great public works, which should be conducted with a view of public interest, and to the just rights of those who make advances for the public benefits, would be in danger of being overlooked and sacrificed in a mercenary conflict of separate local and private interests."

In 1859, when this contract was made, the General Assembly had the same authority it now has in the regulation and control of railroad corporations, but it had not asserted it to the same extent.

Now the statute law vests in the Corporation Commission the power to require railroads to locate stations, etc., with a proviso that the Commission shall not require any railroad company to establish any station nearer to another station than 5 miles. Revisal, sec. 1097.

The evidence shows that Parrott's Avenue is within 2 miles of the station of Falling Creek, established in 1870; 4 miles of Kinston, and 2 miles of a station called Hines Junction. The purpose of this limitation upon the power of the Commission is

for the benefit of the traveling public, who are interested in the speed of the trains and the quick termination of their journeys. Whether or not the railroad company can make this particular stop without detriment to the public service is not a matter a jury can pass on. It is a matter of legislative regulation through the established governmental agency.

If the railroad company has made other contracts like this, the issue may be decided in different ways by different juries.

The safest and wisest course is to follow our previous decisions and the overwhelming weight of authority, and declare such contracts void.

2d. The action is brought to compel specific performance, and regardless of whether the contract is valid in law, a court of equity should not decree specific performance, as the plaintiffs have an adequate remedy at law, and should therefore seek their redress, if any, by an action at law for damages; and no time being fixed, the contract is indefinite, and if perpetual, a court of equity would be assuming an endless duty, inappropriate to its function. *Wilson v. Winchester and R. R. Co.,* 99 Fed., 642; *Marsh & Fairbury v. P. and W. R. R. Co.,* 64 Ill., 414; *Conger v. New York W. S. and B. R. Co.,* 120 N. Y., 29; *R. R. v. State of Florida,* 20 L. R. R. (O. S.), 419; *Mobile and Ohio Ry. Co. v. People,* 132 Ill., 559; *Holladay v. Patterson,* 5 Oregon, 177; Clark on Contracts, sec. 292; Bispham's Equity (6th Ed.), secs. 375-77; Fry on Specific Performance (3d Ed.), secs. 68-9; *Soloman v. Sewerage Co.,* 142 N. C., 439.

*Texas and Pacific Ry. v. City of Marshall,* 136 U. S., 393, is a case in which the Supreme Court of the United States refused to decree specific performance of a contract very much like this. In the opinion *Mr. Justice Miller* says:

"But we are further of opinion that if the contract is to be construed as the appellant insists, it is not one to be enforced in equity. We have already shown that to decree the specific enforcement of this contract is to impose upon the company an obligation without limit of time, to keep its principal office of business at the city of Marshall, to keep its main machine shops there, etc., etc., although the exigencies of railroad business in

PARROTT v. R. R.

Texas may imperatively demand that these establishments be removed to places other than the city of Marshall, and that this would be also required by the convenience of the public.

"It appears to us that if the city of Marshall has under such a contract a remedy for its violation, it is much more consonant to justice that the injury suffered by the city should be compensated by a single judgment in an action at law, and the railroad placed at liberty to follow the course which its best interests and those of the public demand. Nor do we see any substantial difficulty in ascertaining this compensation.

"Though there may not be any rule by which these damages can be estimated with precision, this is not a conclusive objection against a resort to a court of law, for it is very well known that in all judicial proceedings for injuries inflicted by one party on another, whether arising out of tort or out of contract, the relief given by way of damages is never the exact sum which compensates for the injury done, but, with all the rules which have been adopted for the measurement of damages, the relief is only approximately perfect."

And in same case, on page 390, the Court says:

"If the court had rendered a decree restoring all the offices and machinery and appurtenances of the road which have been removed from Marshall to other places, it must necessarily superintend the execution of the decree. It must be making constant inquiry as to whether every one of the subjects of the contracts which have been removed has been restored.

"It must consider whether this has been done perfectly and in good faith, or only in an evasive manner. It must be liable to perpetual calls in the future for like enforcement of the contract, and it assumes, in this way, an endless duty, inappropriate to the functions of the court, which is as ill calculated to do this as it is to supervise and enforce a contract for building a house or building a railroad, both of which have in this country been declared to be outside of its proper functions, and not within its powers of specific performance."

In *Soloman v. Sewerage Co.*, 142 N. C., 448, our Court holds that the plaintiff was not entitled to specific performance, as

there was no time fixed for the duration of the contract, and on page 448 says: "The difficulties in attempting to make or enforce a decree in such a case are pointed out in *Texas, etc., R. R. v. Marshall,* 136 U. S., 393." See, also, Fry on Spec. Performance, sec. 286; Waterman Spec. Perf., 196; *Ten Eyck v. Manning,* 52 N. J. Eq., 47; *Marble Co. v. Ripley,* 77 U. S., 339.

It is useless to multiply authorities. The courts appear to be unanimous that equity will not decree specific performance of a contract of this kind, but will leave the party to his remedy at law.

3d. The contract has no fixed duration, and does not continue forever. It has been fully complied with by the stopping of trains during the lifetime of James M. Parrott, and after his death until 1885.

The contract passed on by the Supreme Court of the United States in the *City of Marshall case* had no limit, and that Court said in reference to it: "It appears to us so far, from this, that the contract on the part of the railroad company is satisfied and performed when it establishes and keeps a depot, and sets in operation car works and machine shops, and keeps them going for eight years, and until the interests of the railroad company and the public demand the removal of some or all of these subjects of the contract to some other place."

In *R. R. v. Scott,* 37 L. R. A. (O. S.), 94, the Court had under consideration a contract like this, and said: "It cannot be true that an agreement on the part of a railway company to establish a station at a particular point is an agreement to keep it there forever. It must be that such agreement is made subject to the general exigencies of business, the public interests, and to the change, modification, and growth of transportation routes, as these may affect the requirements of the railway company's business. The contract having this limitation, we think that the establishment of a railway station, and its maintenance, to the full extent expected or claimed, for thirty years, is, under all the circumstances, a substantial and sufficient compliance with the terms of the contract relied on here. So that, viewing this case from either standpoint, assuming the contract

to be valid or invalid, we are satisfied that no cause of action is shown against the railway company." *R. R. v. Florida,* 20 L. R. A., 419; *Wilson v. Ry. Co.,* 99 Fed., 642.

4th. Another reason why specific performance should not be decreed is that the plaintiffs and those under whom they claim have been guilty of gross laches.

The evidence shows that the platform, which is required by the contract to be kept up by James M. Parrott, was abandoned prior to 1885 and never rebuilt, and the evidence fails to disclose that the defendants' trains recognized the place as a flag station or stopped there from 1885 to the present date. Under such circumstances, the contract is deemed to have been abandoned.

Those who unduly sleep on their rights need not appeal to equity for aid. *Vigilantibus et non dormientibus jura subveniunt.* Bispham Eq., 376.

5th. The paper-writing sued on is a personal contract with James M. Parrott, and is not a covenant running with the land. Therefore the action cannot be maintained by Parrott's heirs at law, but, if at all, only by his administrator for damages.

The obligations contained in the agreement rest only in personal covenant, and are entirely extinguished by a sale of the land or by the death of Parrott. There can be no room for doubt that the parties did not intend to create a burden or servitude upon the land to be borne by it for all time. The contract does not operate as a grant, and creates no easement or burden upon the land which the railroad company can enforce.

If the owners of the land refuse or neglect to keep up the platform, as they have done, the defendants cannot compel them to do so.

In order that a covenant may run with land, that is, that its benefit or obligation may pass with the ownership, it must respect the thing granted or demised, and the act covenanted to be done must concern the land or estate conveyed. 11 Cyc., 1080.

"If a man covenants for himself and his assigns, yet if the thing to be done be merely collateral to the land, and does not

concern the thing demised in any sort, the assignee shall not be charged." *Spencer's case,* 1 Smith L. C.; *Nesbit v. Nesbit,* 1 N. C., 494; *Norfleet v. Cromwell,* 64 N. C., 12.

It seems to be clear that the agreement upon which this action is based was a personal contract upon the part of James M. Parrott, made for his personal convenience, and that it created no burden upon the land, but was collateral to it.

WALKER, J., concurring in dissenting opinion of JUSTICE BROWN : There is one reason that condemns this contract, which is, that it contravenes the settled public policy of the State. Every citizen holds his property, or his contract rights, which is precisely the same thing, subject to the exercise of the police power by the State (*Durham v. Cotton Mills,* 141 N. C., 615; *S. v. Whitlock,* 149 N. C., 542; 1 Dillon Mun. Corporations (3 Ed.), sec. 141; *Mugler v. Kansas,* 123 U. S., 623), and though the exercise of this power by the State in any particular way may have lain dormant for a long time, it can be brought into activity whenever the State, in its judgment, thinks it necessary for the public welfare. It cannot now be doubted that railway corporations are subject to the control of the State in the exercise of this power, and with reference to the subject now under consideration, the State has seen fit to declare its policy and to take charge of the location of railroad depots or stations, a matter of great and vital importance to the public at large.

In the discussion of this question, so far, the injury to the public in the enforcement of this contract seems to have been overlooked, and especially the declared policy of the State in regard to the location of railroad stations. In one of the cases mentioned in the concurring opinion, *Conger v. R. R.,* 120 N. Y., 32, the Court says that if the public will be delayed by the stoppage of trains or the public convenience will be injuriously affected, contracts such as this one will not be enforced; and so we said in *Edwards v. Goldsboro,* 141 N. C., 70, that the public has an interest in the location of railroad stations, its convenience and accommodation being involved. The State, recognizing this fact, has assumed control over railroad com-

panies in matters of construction and operation, as well as in those of transportation. It has provided that stations shall be established within 5 miles of each other. Revisal, sec. 1097 (Laws 1899, ch. 164, sec. 2). That is the minimum distance allowable, and the Corporation Commission, to which is committed the duty and general power to locate stations, with reference to the public convenience and accommodation, is prohibited from so exercising its power as to establish stations at shorter intervals than 5 miles. This prohibition was regarded as essential to the public accommodation, as the more frequent stoppage of trains to take on and let off passengers and freight than allowed by this provision of the law would tend greatly to impede the making and enforcement of proper and convenient schedules. It was considered of more importance to serve the public expeditiously than to afford additional facilities to a single landowner for the use of the trains, whether for passengers or freight, or to enable a railroad company to acquire its right of way by a system of commutation rather than by paying the money for it.

In this particular case the rights or interests of the public seem not to have been taken into consideration by the parties at all, or to have been counted in providing for the convenience of the landowner and the release of the railroad company from the payment of pecuniary compensation for the right of way; and yet they are of paramount importance. Mere private convenience must give way to the public good, is not only a maxim of the law, but has been crystallized into a fixed principle in the government of railroads and the location of stations by our statute.

It was evidently intended that no railroad company should establish a station within 5 miles of another station, that being the minimum distance, in the judgment of the Legislature, which should separate them, so as to subserve the public interest and convenience in the furtherance of transportation of goods and passengers. If the Corporation Commission cannot require or compel the location of any two stations nearer to each other

than 5 miles, the railroad company surely should not be allowed to do so by its own act, in disregard of this declaration of the public policy.

That the contract between these parties has always been subject to the police power, when the Legislature should choose to exercise it, is established beyond any doubt by the recent case of *L. and N. R. R. v. Mottley,* 219 U. S., 467 (55 L. Ed., 297), in which the following propositions were decided by the Court:

"1. An interstate carrier cannot make a valid contract to issue annual passes for life in consideration of a release of a claim for damages since the enactment of the act of 29 June, 1906, sec. 6, expressly prohibiting any carrier from demanding, collecting, or receiving 'a greater or less or different compensation' for the transportation of persons or property, or for any service in connection therewith, than that specified in its public schedule of rates.

"2. An agreement by an interstate carrier to issue annual passes for life in consideration of a release of a claim for damages, though entered into prior to the act of 29 June, 1906, was made unenforcible by the prohibition of section 6 of that act, against demanding, collecting, or receiving 'a greater or less or different compensation' for the transportation of persons or property, or for any service in connection therewith, than that specified in the carrier's published schedule of rates.

"3. Congress, in the exercise of its power over commerce, could enact the provisions of the act of 26 June, 1906, sec. 6, which rendered unenforcible a prior contract, valid when made, by which an interstate carrier agreed to issue annual passes for life in consideration of a release of a claim for damages.

"4. The constitutional liberty of the citizen to make contracts was not infringed by the enactment by Congress, in the exercise of its power over commerce, of the provisions of the act of 29 June, 1906, sec. 6, which rendered unenforcible a prior contract, valid when made, by which an interstate carrier agreed to issue annual passes for life in consideration of a release of a claim for damages."

It appears in the record of this case that there are three other stations within 5 miles of the one proposed to be established, which would seem to be a palpable violation of the spirit and intent of the statute, if not of its letter. Revisal, sec. 1097, is very broad and comprehensive in conferring jurisdiction, so to speak, upon the Corporation Commission with reference to the location of stations. It is given thereby the sole power of deciding and directing where "the public necessity demands" that stations shall be established and "what depot accommodations will be commensurate" with the business and revenue of the railroad company, with the limitation, as we have pointed out, that stations shall not be nearer to each other than 5 miles. And it may order a change of stations and of depot facilities "to promote the security, convenience, and accommodation of the public." This matter is not left to be determined by the personal whims or selfish interests of individuals or of the railroad company, but to an administrative body, supposed to represent impartially the great body of the people, and especially the traveling public, whose interests it vitally affects, and which has a deep concern in the proper location of stations, so that their number and proximity may not seriously retard transportation. If these views are correct, and they seem clearly to be so, it will be unnecessary to inquire whether the contract was valid and enforcible in equity at the time it was made, as it has since become invalid, being against the expressed policy of the State, and is, therefore, unenforcible at this time.

The Legislature could not well have declared the State's policy more plainly than it has in the section of the Revisal to which I have referred. It has manifested its will in unmistakable language, that stations shall be 5 miles apart, and this was done for the sake of the public and without regard to private interests. If the Corporation Commission, having general charge of such matters, cannot authorize what is proposed to be done here, why should the railroad company and the plaintiffs, for their own convenience, be permitted to do it, contrary to the evident policy of the statute which was passed, not to favor the railroad company, but to prevent any too great restriction being placed

PARROTT v. R. R.

on transportation for the sake of the public; and for that reason the Legislature prescribed what distance between stations would subserve the desired purpose.

Agreements of this character introduce mercenary considerations to influence the conduct of parties, instead of those arising from the nature of their duties and the most efficient way of discharging them. They are, therefore, baneful in their tendencies. *Woodstock Iron Co. v. R. and D. Extension Co.,* 129 U. S., 643; *Providence Tool Co. v. Norris,* 69 U. S., 48. As said in the latter case, at p. 58: "The law looks to the general tendency of such agreements, and it closes the door to temptation by refusing them recognition in any of the courts of the country." A like rule was thus stated in *Holladay v. Patterson,* 5 Oregon, 177: "A railroad company is a *quasi*-public corporation, and the public have an interest in the location of their lines of road and depots. An agreement which tends to lead persons, charged with the performance of trusts or duties for the benefit of others, to violate or betray them, will not be enforced." See, also, *R. R. v. Marshall,* 136 U. S., 393. We find it also stoutly maintained in *R. R. v. Seely,* 45 Mo., 212. The Court there said: "But the broad position is taken that the company is a private corporation, and has the right to buy and hold all kinds of property the same as an individual. This position is wholly indefensible. Whilst it is true, in one sense, that it is a private corporation, yet the public is deeply interested in it. Its chartered privileges and franchises were not granted solely and exclusively for private benefit and emolument, but to subserve a great public interest. In *Walther v. Warner,* 25 Mo., 277, this Court decided that the building of a railroad by a private corporation, under the authority of the Legislature, for the public accommodation, was a public use for which private property might be lawfully taken. In all these enterprises there is a mingling of both public and private benefit, and the interests of the public are not to be sacrificed to mere private gain." That case also decides expressly that an agreement to give land in exchange for the location of a station at a specified place on plaintiff's other land will not be enforced, as it is contrary to public policy.

PARROTT *v.* R. R.

"The specific execution of a contract in equity," the Court held in *Marsh v. R. R.*, 64 Ill., 414, "is a matter not of absolute right in the party, but of sound discretion in the court, and in deciding whether specific performance should be enforced against a railway company, the court must have regard to the interests of the public. *Raphael v. R. R.*, Law Rep. 2 Eq. Cases, 37.

The location of railroad depots has much to do with the accommodation of the wants of the public. And when once established, a change of affairs may require a change of location, in order to suit public convenience. We cannot admit that an individual is entitled to call for the interference of a court of equity to compel a railroad company to locate unchangeably its depot at a particular spot to subserve the private advantage of such individual. Railroad companies, in order to fulfill one of the ends of their creation—the promotion of the public welfare—should be left free to establish and reëstablish their depots wheresoever the accommodation or the wants of the public may require. To grant the relief asked for by the complainant, we would regard as against public policy; and he must be left, for whatever remedy he may have, to his suit at law for damages." *St. Joseph and D. C. R. R. v. Ryan*, 11 Kan., 302 (opinion by *Brewer, J.*), holds that, "Railroad corporations are, as we have seen, public agencies and perform a public duty. They are agencies created by the public, with certain privileges, and subject to certain obligations. A contract that they will not discharge, or by which they cannot discharge, those obligations, is a breach of that public duty, and cannot be enforced." It was also said that they are under an obligation to use the utmost human sagacity and foresight in the construction and operation of their roads, and this duty they must exercise impartially for the public good, and not neglect in any particular or degree, in order to advance their own or other private interests. The purchased consent of the railroad to the establishment of a station, where it is discharging a duty owing to the public, is against the law's policy, because it is unjust to that public, as it deprives the company of the freedom of action which it should

165—21

always have in order to serve those from whom it derived its franchise, instead of its own selfish interests. This principle is profusely illustrated in *Drain v. Chicago City Ry.*, 160 Ill., 22. In another case (*Burney's Heirs v. Ludeling*, 47 La. Ann., 73), where it is held that contracts of the kind we are now considering are void, as being against public policy, the Court said: "The railroad corporation was a *quasi*-public agent, and it was its duty, independent of any agreement to secure an advantage to it, to establish its stations at points most convenient for the public interests. An agreement, therefore, by the corporation for a part of the land, to establish its depots or stations at particular points, is illegal. All agreements which tend to injure the public service are illegal." For the very reason that where private interests are at stake the public welfare is sure to be overlooked, if it conflicts, the Legislature has wisely assumed control of this matter in this State by providing the minimum distance between stations, in the interest of the public convenience. It clearly had the power to do so. "The property of railroad corporations is devoted to a public use. The truth of this proposition is nowhere questioned. Such corporations may exercise the right of eminent domain by taking lands for their roads against the will of the owners. The business of providing highways and arranging conveniences to enable people easily to pass from place to place is a part of the public business which may be done by the State. If the State grants franchises and delegates the transaction of this business to corporations, it retains the right to regulate the business for the public good in any reasonable way. It may do this in the exercise of the police power, which is a power inherent in every well ordered system of government."

It will not answer this position to say that the railroad company and individuals may violate this provision of law so long as the Corporation Commission does not intervene in behalf of the public. The point is that the Legislature has declared its will to be that a proper distance for the public interests is 5 miles, as it was considering only the public welfare in passing

the law, and prescribed a rule that would promote it. In none of the cases cited in support of the Court's conclusion had the Legislature thus spoken upon the matter.